The GUARDIANS ASSOCIATION OF the NEW YORK CITY POLICE DEPARTMENT, INC., the Hispanic Society of the New York City Police Department, Inc., Oswaldo Perez and Felix E. Santos; Individually and on behalf of all others similarly situated, Plaintiffs–Appellees,

v.

CIVIL SERVICE COMMISSION OF the CITY OF NEW YORK, Department of Personnel of the City of New York, The New York City Police Department, Alphonse D'Ambrose, Individually and in his capacity as Chairman of the Civil Service Commission of the City of New York and Personnel Director of the City of New York, James Smith and Josephine Gambino, Individually and in their capacity as members of the Civil Service Commission of the City of New York, and Michael J. Codd, Individually and in his capacity as Commissioner of the New York Police Department, Defendants–Appellants.

No. 1340, Docket 79–7377.

United States Court of Appeals, Second Circuit.

Argued Aug. 15, 1979.

Decided July 25, 1980.

---

above, the damages were tripled as to Beranger, but not as to King, Carefree and Lenoci. Total damages were $5779.00.

Laurence A. Silverman, New York City (Christopher Crowley, John J. Brandow, Diane Krejsa, Nancy Ludmerer, D. Stephen Mathias, Margarita Rosa, M. D. Taracido, Kenneth Kimerling, Puerto Rican Legal Defense and Education Fund, Inc., New York City, of counsel), for plaintiffs–appellees.

L. Kevin Sheridan, Asst. Corp. Counsel, New York City (Allen G. Schwartz, Corp. Counsel, Leonard Koerner, Judith A. Levitt, Asst. Corp. Counsels, New York City, of counsel), for defendants–appellants.

Issie L. Jenkins, Acting Gen. Counsel, Joseph T. Eddins, Jr., Associate Gen. Counsel, Lutz Alexander Prager, Paul E. Mirengoff, Equal Employment Opportunity Commission, Washington, D. C., as amicus curiae.

Before MESKILL, Circuit Judge, and KELLEHER * and COFFRIN**, District Judges.

MESKILL, Circuit Judge:

This appeal raises a number of important questions in the area of employment discrimination law to which there are as yet no definitive answers. In order to determine the rights of the parties to this action we must explore such concepts as disproportionate impact and job–relatedness and must resolve such issues as when a particular discriminatory hiring practice ceases for purposes of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.; whether there exists an implied private cause of action for compensatory relief under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d and whether 42 U.S.C. § 1981 prohibits conduct having a discriminatory impact absent proof of discriminatory purpose.

Unfortunately, the authorities do not speak with one voice. The only thing that has been clear, as we have considered this case, is that whichever way these issues are finally resolved, the impact on the future direction of employment discrimination litigation will be substantial. We are aware that because of the importance and complexity of these questions, today's decision will not put them to rest. Therefore, in order to facilitate the continued consideration of these issues in other forums, we have attempted to explain the factual setting and the reasoning underlying our determinations in some detail.

## I.

## BACKGROUND

In 1972 a lawsuit was brought by black and Hispanic police officers challenging seven written examinations administered during the years 1968–1970 and used in making appointments to the New York City Police Department ("NYPD" or "department") until 1974. The complaint alleged that these entry–level examinations had a racially disproportionate impact and were not job–related and, therefore, that the use by the department of lists ranking eligibility for appointment on the basis of the results of these examinations was unlawful under various federal and state laws. In Guardians Association v. Civil Service Commission, 490 F.2d 400 (2d Cir. 1973) ("Guardians I"), this Court upheld the district court's denial of a preliminary injunction against the continued use of these eligibility lists, on the ground that the lists had been exhausted. Neither party took any further steps in regard to Guardians I until June of 1975 when, in response to a fiscal crisis, New York City laid off over 2,500 police officers. When plaintiffs' attempt to revive the case proved unsuccessful, they commenced the present action in the United States District Court for the Southern District of New York before Robert L. Carter, Judge, in April of 1976.[1]

In the new action the June layoffs, which were carried out pursuant to the department's "last–hired, first–fired" policy, were alleged to be violative of the Fourteenth Amendment, 42 U.S.C. §§ 1981 and 1983, Title VII and Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. and

---

* Hon. Robert J. Kelleher, United States District Judge for the Central District of California, sitting by designation.

** Hon. Albert W. Coffrin, United States District Judge for the District of Vermont, sitting by designation.

1. Plaintiffs–appellees ("plaintiffs") are The Guardians Association of the New York City Police Department, Inc., The Hispanic Society of the New York City Police Department, Inc., and Oswaldo Perez and Felix E. Santos, individually and on behalf of all others similarly situated. Defendants–appellants ("defend-

ants") are the Civil Service Commission of the City of New York, the Department of Personnel of the City of New York, the New York City Police Department, and various officials representing these three institutions, individually and in their official capacities. The Civil Service Commission prescribes rules for implementing New York's civil service laws. The personnel department prepares and administers the police department's entry examinations. Guardians Association v. Civil Service Commission, 431 F.Supp. 526, 531 (S.D.N.Y. 1977) ("Guardians II").

2000d *et seq.*, as well as various other federal and state laws. Central to the attack on the system of layoff by seniority was the contention that the department's entry level examinations were discriminatory, and that but for this discrimination plaintiffs would have been hired earlier and thus would have accrued sufficient seniority to withstand being fired.[2] In *Guardians Association v. Civil Service Commission*, 431 F.Supp. 526 (S.D.N.Y.1977) *("Guardians II")*, Judge Carter certified the proposed class, which consisted of "all black and Hispanic New York City policemen currently on layoff who would not have been furloughed but for defendants' allegedly discriminatory employment practices," and granted a preliminary injunction restraining the department from firing or recalling any officers until the seniority lists were reordered "to accord plaintiffs the seniority they would have had but for defendants' discriminatory practices." *Id.* at 531, 530. Judge Carter held that although plaintiffs had failed to make out a case under the federal Constitution, § 1981 or § 1983, they had demonstrated entitlement to relief under Title VII.[3] He found: (1) that under Title VII plaintiffs had established a prima facie case of discrimination in hiring[4] by demonstrating that the challenged entry examinations had a disproportionate impact, that is, that as a group black and Hispanic applicants achieved lower scores than white applicants, and (2) that defendants had failed to rebut plaintiffs' case by demonstrating the job–relatedness of these examinations. Further, rejecting defendants' argument that no post–Act discriminatory conduct had been alleged, the district court held that the 1975 layoff of police officers pursuant to a concededly neutral last–hired, first–fired system perpetuated the effects of the department's pre–1972 discriminatory practices and thus fell within the scope of Title VII.[5]

On June 21, 1977, this Court vacated the preliminary injunction and remanded the case for reconsideration in light of *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), which had been handed down after Judge Carter's decision in *Guardians II* but prior to argument of the appeal. *Guardians II*, on appeal, 562 F.2d 38 (2d Cir. 1977). In *Teamsters* the Supreme Court ruled that a bona fide seniori-

---

**2.** In both *Guardians I* and *Guardians II* plaintiffs attacked the department's minimum height requirement as well as its use of the challenged examinations. Plaintiffs contended that the 5′ 7″ minimum, dropped by the department in 1973, had, while it was in effect, disqualified a disproportionate number of Hispanics in the pool of potential applicants. Although it had earlier determined that the height requirement was unlawful under Title VII, *Guardians II*, 431 F.Supp. at 550–51, after remand the district court held that a court challenge to the height requirement was barred bécause as to this particular employment practice there had been no timely filing of a charge with the Equal Employment Opportunity Commission ("EEOC"). *Guardians Association v. Civil Service Commission*, 466 F.Supp. 1273, 1278, n. 7 (S.D.N.Y.1979) *("Guardians III")*. See note 7, *infra*. Perhaps because all class members took the challenged examinations and were on that ground alone held entitled to relief, *Guardians III*, 466 F.Supp. at 1280 n. 10, no appeal was taken from this ruling. We therefore express no view on the substantive or procedural issues raised by plaintiffs' challenge to the minimum height requirement. Regarding the propriety of taking the height require-

ment into account in fashioning a remedy, *see* section VI of this opinion.

**3.** The district court's granting of full relief under Title VII rendered unnecessary any discussion of plaintiffs' Title VI claim. *Guardians II*, *supra*, 431 F.Supp. at 530 n. 2.

**4.** Discrimination in hiring is prohibited by § 703(a)(1) which provides in relevant part:
 (a) It shall be an unlawful employment practice for an employer—
 (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . .
42 U.S.C. § 2000e–2(a)(1).

**5.** When the Act was first passed municipalities were not defined as "employers" under Title VII, *see* 42 U.S.C. § 2000e(b), and therefore were not subject to its provisions. The Equal Employment Opportunity Act of 1972, 86 Stat. 103, effective date, Mar. 24, 1972, amended the statute so as to bring municipal employers within its purview.

ty system which merely perpetuated the effects of pre–Title VII discrimination beyond the effective date of the Act was immunized from attack by § 703(h) of the statute.[6] Recognizing that *Teamsters* effectively overruled his earlier determination, Judge Carter reassessed plaintiffs' case in order to determine what claims, if any, survived:

> Under *Teamsters*, a meritorious Title VII claim against a municipality requires an act of discrimination after March 24, 1972, rather than discrimination before that date whose effects are felt thereafter through a facially neutral seniority system. . . . If plaintiffs can now show that the results of [the discriminatory] entrance tests contributed to discriminatory acts committed *after* March 24, 1972, the *Teamsters* requirement will have been met.

*Guardians Association v. Civil Service Commission*, 466 F.Supp. 1273, 1276–77 (S.D.N.Y.1979) (*"Guardians III"*).

The district judge reasoned that "[s]tripped of the argument concerning the NYPD's seniority system, plaintiffs' allegations are reduced to claims of discriminatory refusals to hire." *Id.* at 1277. Noting that "[d]iscriminatory refusal to hire is a well established basis for awarding a dis-

criminatee seniority retroactive to the date upon which he would have been hired but for the discrimination," finding that the last such refusal to hire ceased on October 7, 1974, two years after Title VII was made applicable to municipalities, and finding further that a timely charge had been filed with the Equal Employment Opportunity Commission ("EEOC"),[7] Judge Carter concluded that plaintiffs were entitled to relief under Title VII. *Id.* at 1277–78.

Judge Carter declined to limit relief to those plaintiffs who had been refused employment at some point within the 300 days preceding the filing of the EEOC charge. Relying on *Acha v. Beame*, 570 F.2d 57 (2d Cir. 1978), the district court held that the use of the eligibility lists to determine the order in which applicants were hired amounted to a continuing policy of discriminatory hiring and thus a continuing violation of Title VII.

> The refusals to appoint minorities were not discrete acts; they were all made on the same basis, *viz.*, scores on the defective tests. After the tests were administered and the results certified, the NYPD embarked on a discriminatory hiring program which terminated only when the last person was hired off the lists. Since

---

6. Section 703(h) of Title VII provides in part:
 > Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system, or a system which measures earnings by quantity or quality of production or to employees who work in different locations provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin, nor shall it be an unlawful employment practice for an employer to give and to act upon the results of any professionally developed ability test provided that such test, its *administration or action upon the results* is not designed, intended or used to discriminate because of race, color, religion, sex or national origin.

 42 U.S.C. § 2000e–2(h).

7. The filing of a timely charge with the EEOC is a prerequisite to a private action under Title VII. *See* § 706(e) of Title VII, 42 U.S.C. § 2000e–5(e); *McDonnell Douglas Corp. v.*

*Green*, 411 U.S. 792, 798, 93 S.Ct. 1817, 1822, 36 L.Ed.2d 668 (1973); *Silver v. Mohasco Corp.*, 602 F.2d 1083, 1087 (2d Cir.), *rev'd on other grounds*, —— U.S. ——, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980). The parties agree that the 300 day limitation period, the longer of the two limitation periods established by § 706(e), is applicable in the instant case.

A charge filed on behalf of the Guardians Association on May 23, 1975, was held by the district court to encompass a claim of discriminatory refusal to hire. *Guardians III*, 466 F.Supp. at 1278. Particularly in light of the liberality with which such charges are to be construed, *Silver v. Mohasco Corp., supra*, 602 F.2d at 1090–91, we will not disturb this finding. On appeal, defendants do not challenge the district court's ruling giving the entire plaintiff class the benefit of this filing. *See Guardians III*, 466 F.Supp. at 1278 n. 6, *citing Acha v. Beame*, 438 F.Supp. 70, 76 (S.D.N.Y. 1977), *aff'd*, 570 F.2d 57 (2d Cir. 1978); *Macklin v. Spector Freight Systems, Inc.*, 478 F.2d 979, 985 n. 11 (D.C.Cir.1973).

E.E.O.C. charges were filed within 300 days of the last illegal appointment, all plaintiffs are deemed to have made timely challenge to the defendants' discriminatory actions.

*Guardians III*, 466 F.Supp. at 1280. Ruling that the rehiring of members of the original class had not mooted the case, Judge Carter revised the class definition to include all black and Hispanic policemen "previously on layoff who would not have been furloughed but for defendants' discriminatory practices." *Id.* at 1278.

Having determined that the types of relief sought under Title VII could not properly take into account any conduct occurring before March 24, 1972, Judge Carter considered plaintiffs' Title VI claim in order to determine whether additional relief was available. After reviewing the legislative history of the statute and the relevant cases, Judge Carter held first, that § 601 impliedly conferred a right of action on private individuals, and second, that Title VI banned both intentional discrimination and conduct which has a discriminatory impact. In light of the fact that unlike Title VII, Title VI has been applicable to municipalities since 1964, Judge Carter concluded that all members of the plaintiff class were entitled to compensatory seniority extending back to the date upon which they would have been hired but for defendants' discriminatory practices. The preliminary injunction which had been vacated by this Court was therefore reinstated by order dated May 15, 1979. This appeal followed.[8]

As a preliminary matter, defendants dispute Judge Carter's finding that the challenged examinations were discriminatory, that is, that they had a disproportionate impact not justified by a showing of job–relatedness. Defendants also contend that even if the examinations were discriminatory, any discriminatory conduct on their part ceased before Title VII became applicable to municipalities and, further, was not the subject of a timely filing with the EEOC. Additionally, defendants take issue with Judge Carter's analysis of Title VI. They argue that the statute is addressed only to purposeful discrimination. Endorsing the district court's rejection of § 1981 as a basis for relief, defendants conclude that plaintiffs have failed to make out a case for the readjustment of their seniority. In response, plaintiffs urge the soundness of the district court's factfinding, the inevitability of its approach to the Title VII and Title VI issues, and the propriety of the relief granted. The EEOC, as amicus curiae, addresses solely the § 1981 issue, urging that this Court reject the intent standard announced below.

Although this is the second time this case has come before us, we have not previously reviewed either the factual findings or the legal conclusions reached by the district court.[9] We start with the contested issues of fact.

II.

THE CHALLENGED EXAMINATIONS

In *Guardians II*, Judge Carter set forth accurately and succinctly the proper method of evaluating the challenged examinations under Title VII:[10]

> today whether, under Title VII, selection procedures must be judged in isolation from one another or whether an employer's entire hiring process must be judged by its end results. *Compare Brown v. New Haven Civil Service Board*, 474 F.Supp. 1256, 1260–61 (D.Conn. 1979) (holding that plaintiffs may not challenge disproportionate impact of written exam that forms only one part of hiring process the end result of which is not disproportionate; "number of Blacks hired as a percentage of the Black applicants is roughly the same as that for Whites") *with Guardians II*, 431 F.Supp. at 540.

---

**8.** On August 15, 1979, this Court granted a partial stay of Judge Carter's order of May 15, 1979, pending disposition of the appeal.

**9.** As was noted above, this Court vacated the original preliminary injunction in June of 1977, 562 F.2d 38 (2d Cir. 1977), without reaching the merits of the appeal and directed Judge Carter to reconsider the case in light of *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

**10.** Defendants do not claim that the hiring process, viewed as a whole, ameliorated any disproportionate impact created by the written examinations. We therefore need not decide

In *Griggs v. Duke Power Co.* [401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971)], the Supreme Court held that Title VII forbids the use of employment selection practices that have a racially discriminatory impact unless the employer meets "the burden of showing that [the selection practices have] . . . a manifest relationship to the employment in question." *Id.* at 432, [91 S.Ct. at 854]. This burden arises only after the complaining party or class has made out a prima facie case of discrimination. The Court held in *Albemarle Paper Company v. Moody,* 422 U.S. 405, [95 S.Ct. 2362, 45 L.Ed.2d 280] (1975) that a prima facie case is made out if the complainants can show "that the tests in question select applicants for hire or promotion in a racial pattern significantly different from that of the pool of applicants." *Id.* at 425, [95 S.Ct. at 2375]. *See also McDonnell Douglas Corp. v. Green,* 411 U.S. 792, [93 S.Ct. 1817, 36 L.Ed.2d 668] (1973). A showing of discriminatory purpose need not be made under Title VII. *Griggs, supra; Albemarle, supra.*

431 F.Supp. at 538. Under the "clearly erroneous" standard of review, we see no basis for overturning the factual findings which prompted Judge Carter to conclude that, judged by this standard, the examinations were discriminatory.[11] Fed.R.Civ.P. 52(a).

A. *Disproportionate Impact*

In 1973 the parties to the *Guardians I* suit authorized the Rand Institute to conduct an independent study of NYPD's entry level examinations to determine the passing rates of whites, blacks, and Hispanics.[12] The results of two examinations were analyzed; these tests, one administered in 1968 and one in 1970, were respectively the earliest and the most recent tests with eligibility lists still in use at the time of the study.

As the district court noted, because the department did not keep systematic records of the race or ethnic background of applicants, Rand relied on various indirect methods of racial and ethnic identification.

Five different sources of data were used: (1) [NYPD] records giving the race of about 30 percent of the applicants taking each examination; (2) results of a questionnaire inquiring into race which was mailed to nearly all persons who took the examinations; (3) a compilation of approximately 8,000 surnames compiled by the U.S. Bureau of Census with which the subjects' names were compared; (4) census tract data, evidencing racial residential concentration with which the subjects' addresses were matched; and (5) a telephone sample of the subjects whose race remained unknown after the [NYPD] data and the questionnaire data were on hand.

*Guardians II, supra,* 431 F.Supp. at 539 (footnote omitted). On the basis of the information thus gathered, Rand determined the racial or ethnic identity of those taking each examination. Rand then proceeded to estimate the distribution by group of the scores. In summarizing its findings, Rand stated:

"[w]e have found substantial and statistically significant differences by race in the distributions of exam scores for whites as compared to blacks and Hispanics . . . . Blacks and Hispanics scored lower than whites and failed at higher rates . . . . These findings were confirmed by three different methods of data analysis." Rand Report at 46.

*Guardians II,* 431 F.Supp. at 540 (footnote omitted). Furthermore, because of the sim-

---

*See* Uniform Guidelines, 29 C.F.R. § 1607.4(C). The Uniform Guidelines are discussed in note 16, *infra.*

**11.** As a detailed account is available in the district court's published opinion, *Guardians III,* 466 F.Supp. 1273, we summarize only so much of Judge Carter's comprehensive treatment of the evidence upon which he relied as is necessary to make clear why his finding of disproportionate impact must stand.

**12.** The district court, apparently adopting the usage of the Rand Report, referred to the categories of white, black and Hispanic as three distinct "racial" groups for purposes of statistical analysis.

ilarity of the patterns observed for the two examinations analyzed, Rand concluded that it was "confident" that these patterns were "'most likely typical of the patterns for all recent civil service patrolmen's exams.'" Rand Report at 38, quoted in *Guardians II*, 431 F.Supp. at 540.

At the hearings held before the initial issuance of the preliminary injunction, each side presented expert testimony regarding the significance of the Rand Report. As Judge Carter noted, the methodological criticisms offered by defendants' witness were seriously undercut by the fact that Rand came up with similar figures using three different methods to estimate the distribution by group of the scores. Similarly, while only two of the challenged tests were studied by Rand, the similar distribution patterns made reasonable the inference that similarly drawn examinations would yield similarly skewed results. Although defendants attempted to cast doubt on the accuracy of the Rand finding of disproportionate impact, they offered no evidence tending to establish that white, black and Hispanic applicants performed equally well, or comparably, on any or all of the challenged examinations.[13] Finally, since the methodology was derived and the data compiled by independent professionals selected by agreement of the parties, we have no reason to question the objectivity of the research.

On the basis of the record before us we cannot conclude that Judge Carter's finding of disproportionate impact was clearly erroneous. Defendants attack the Rand study as guesswork. However, the fact that Rand was required to estimate the racial and ethnic composition of the applicant pools and the distribution by group of the scores does not invalidate Rand's conclusions. The science of statistical analysis encompasses more than the mere notation of directly observed phenomena. Necessity often dictates that the composition of a given population be estimated by projecting data gathered by less than optimal means from only a sample of that population. If the sample is adequate, the data gathering techniques reliable, and the conclusions drawn demonstrated to be statistically significant, such estimates and projections may properly be admitted into evidence.[14]

---

**13.** We see no justification for holding plaintiffs to an unrealistic standard regarding the "completeness" of their statistical showing. As Judge Weinfeld observed in *Vulcan Society v. Civil Service Commission*, 360 F.Supp. 1265, 1270 (S.D.N.Y.), aff'd, 490 F.2d 387 (2d Cir. 1973), "where public employment practices are under challenge defendants usually have superior access to relevant statistical data than plaintiffs and . . . the latter will often be dependent on the efforts and good faith of the former." For this reason it is not inappropriate to expect a public employer to come forward with evidence on the disparate impact issue even where the plaintiffs' showing has been somewhat modest.

In the instant case, although the Rand study focused on only two examinations, plaintiffs offered sufficient evidence to support the inference that *all* the challenged examinations had a disparate impact on blacks and Hispanics. Defendants were unwilling or unable to introduce persuasive evidence indicating otherwise. They introduced no statistics tending to show that even one of the examinations was in fact neutral in impact. On the contrary, the results of defendants' own study of one challenged examination, given in 1969 and not included in the Rand study, indicates that defendants' information would tend to confirm rather than contradict the Rand conclusion. (Exhibit K to Crawley Affidavit.) Furthermore, defendants offered no persuasive evidence of differences in preparation or content that would cast doubt on Rand's conclusion that the two examinations studied were representative of all those given in the years 1968 to 1970.

The plaintiffs in a case such as this are not required to exhaust every possible source of evidence, if the evidence actually presented on its face conspicuously demonstrates a job requirement's grossly discriminatory impact. If the employer discerns fallacies or deficiencies in the data offered by the plaintiff, he is free to adduce countervailing evidence of his own. In this case no such effort was made. *Dothard v. Rawlinson*, 433 U.S. 321, 331, 97 S.Ct. 2720, 2727, 53 L.Ed.2d 786 (1977) (footnote omitted).

**14.** Despite defendants' protestations this case is not like *New York City Transit Authority v. Beazer*, 440 U.S. 568, 584–85, 99 S.Ct. 1355, 1365, 59 L.Ed.2d 587 (1979), where, of the two crucial statistics relied on to establish the discriminatory impact of a particular employment practice, one was substantially overinclusive and the other substantially underinclusive. In *Beazer*, the problem was not that it was neces-

[S]tatistical evidence by its very nature deals with probabilities rather than certainties. All that can be required of methods employed in gathering such evidence is that they assure reasonably accurate findings. Absolute perfection usually is not attainable in this kind of endeavor.

*Vulcan Society v. Civil Service Commission,* 360 F.Supp. 1265, 1270 (S.D.N.Y.), *aff'd,* 490 F.2d 387 (2d Cir. 1973) (footnote omitted). Not being generally obtainable, "absolute perfection" is not required. *See, e. g., Jones v. New York City Human Resources Administration,* 528 F.2d 696, 698 (2d Cir.), *cert. denied,* 429 U.S. 825, 97 S.Ct. 80, 50 L.Ed.2d 88 (1976). As Judge Friendly wrote, affirming the district court's decision in *Vulcan Society* and quoting Mr. Justice Holmes:

It may well be that the cited figures and other more peripheral data relied on by the district judge did not prove a racially disproportionate impact with complete mathematical certainty. But there is no requirement that they should. "Certainty generally is illusion, and repose is not the destiny of man." We must not forget the limited office of the finding that black and Hispanic candidates did significantly worse in the examination than others. That does not at all decide the case; it simply places on the defendants a burden of justification which they should not be unwilling to assume.

490 F.2d at 393 (footnote omitted).

B. *Job–Relatedness*

Under the familiar Title VII formula, since plaintiffs established a prima facie case of discrimination,[15] the burden shifted to defendants to demonstrate that the challenged examinations were job–related. *Dothard v. Rawlinson,* 433 U.S. 321, 329, 97 S.Ct. 2720, 2726, 53 L.Ed.2d 786 (1977).

A job–related examination is one that accurately tests the capacity of the applicant to do the job for which he is applying, or is "reasonably constructed to measure what it purports to measure." Although this notion is a simple one, the task of determining whether an examination is in fact job–related involves issues and problems which are outside the experience of most laymen. Consequently, courts confronted with litigation of this kind have placed considerable reliance upon generally accepted principles of psychological testing which have been developed for the purpose of assuring that employment . . . tests measure what they purport to measure. Indeed, insistence upon the use of generally accepted professional standards of employment test validation would appear to be precisely the correct response to a prima facie showing of discriminatory impact upon racial minorities; for if an examination which disadvantages racial minorities does in fact conform to professional standards of job–relatedness, that provides at least some assurance that the white majority has not placed a burden upon racial minorities which it would have been unwilling to place upon others.

*Vulcan Society, supra,* 360 F.Supp. at 1272–73 (footnotes omitted). *See also Blake v. City of Los Angeles,* 595 F.2d 1367, 1377–79 (9th Cir. 1979).

■ Although defendants argued below that the validity of the entry–level examinations had been demonstrated by two different generally accepted methods,[16] after

---

sary to make estimates and projections from incomplete data but rather that there was no information in the record from which the required estimates and projections could properly be derived.

**15.** It is well established that "[a] prima facie violation of the Act may be established by statistical evidence showing that an employment practice has the effect of denying the members of one race equal access to employ-

ment opportunities." *New York City Transit Authority v. Beazer, supra,* 440 U.S. at 584, 99 S.Ct. at 1365. *See also International Brotherhood of Teamsters v. United States, supra,* 431 U.S. at 339–40, 97 S.Ct. at 2731–2732.

**16.** The courts in this Circuit have recognized three methods of demonstrating the job–relatedness of an employment examination. As the Supreme Court noted in *Washington v. Davis,* 426 U.S. 229, 247 n.13, 96 S.Ct. 2040, 2051 n.13,

considering the testimony of experts called by both sides, Judge Carter determined that defendants had failed to carry their burden.[17] On the record before us we cannot characterize this finding as erroneous.

### 1. Content Validity

An examination has content validity if the content of the examination matches the content of the job. For a test to be content valid, the aptitudes and skills required for successful examination performance must be those aptitudes and skills required for successful job performance. It is essential that the examination test these attributes both in proportion to their relative importance on the job and at the level of difficulty demanded by the job.

*Vulcan Society, supra,* 360 F.Supp. at 1274 (footnotes omitted). The logical first step in drafting a content valid test is a careful study of the job in question.[18] *See Jones v. New York City Human Resources Adminis-*

*tration,* 391 F.Supp. 1064, 1077–83 (S.D.N.Y. 1975), *aff'd,* 528 F.2d 696 (2d Cir.), *cert. denied,* 429 U.S. 825, 97 S.Ct. 80, 50 L.Ed.2d 88 (1976); *Kirkland v. New York State Department of Correctional Services,* 374 F.Supp. 1361, 1373 (S.D.N.Y.1974), *aff'd in pertinent part,* 520 F.2d 420 (2d Cir. 1975), *cert. denied,* 429 U.S. 823, 97 S.Ct. 73, 50 L.Ed.2d 84 (1976). Judge Weinfeld has defined a proper job analysis as:

a thorough survey of the relative importance of the various skills involved in the job in question and the degree of competency required in regard to each skill. It is conducted by interviewing workers, supervisors and administrators; consulting training manuals; and closely observing the actual performance of the job.

*Vulcan Society, supra,* 360 F.Supp. at 1274. Because of the unlikelihood that an examination prepared without benefit of a probing job analysis will be content valid, Judge Weinfeld has suggested that in the absence of such an analysis the proponent of the

---

48 L.Ed.2d 597 (1976), the professional testing standards developed by the American Psychological Association ("APA") accept the same three methods:

"empirical" or "criterion" validity (demonstrated by identifying criteria that indicate successful job performance and then correlating test scores and the criteria so identified); "construct" validity (demonstrated by examinations structured to measure the degree to which job applicants have identifiable characteristics that have been determined to be important in successful job performance); and "content" validity (demonstrated by tests whose content closely approximates tasks to be performed on the job by the applicant).

In 1970 the EEOC promulgated its Guidelines on Employee Selection Procedures ("EEOC Guidelines"), 35 Fed.Reg. 12333 (Aug. 1, 1970). These EEOC Guidelines remained in effect until they were superseded in 1978 when the EEOC (along with the Civil Service Commission, the Department of Labor, the Department of Justice, and the Treasury Department) adopted the Uniform Guidelines on Employee Selection Procedures ("Uniform Guidelines"), 43 Fed.Reg. 38290, 40223 (Aug. 25, 1978; Sept. 11, 1978). Both the EEOC Guidelines and the Uniform Guidelines recognize the three basic methods of test validation accepted by the APA.

The Supreme Court has held in both *Griggs v. Duke Power Co.,* 401 U.S. 424, 433–34, 91 S.Ct. 849, 854–55, 28 L.Ed.2d 158 (1971) and *Albemarle Paper Co. v. Moody,* 422 U.S. 405,

431, 95 S.Ct. 2362, 2378, 45 L.Ed.2d 280 (1975), that the EEOC Guidelines express the will of Congress in passing Title VII and are entitled to great deference. Since both the EEOC Guidelines and the Uniform Guidelines shed light on the concept of job–relatedness and since the differences between the two sets of Guidelines are of no significance in the instant case, we will make reference to both in our discussion. *Compare* Uniform Guidelines, 29 C.F.R. § 1607.1–14 (1979) *with* EEOC Guidelines, 29 C.F.R. § 1607.1–14 (1971).

**17.** Defendants suggest in their brief that as a municipal employer not charged with bad faith, the department should be held to a somewhat relaxed standard of job–relatedness. However, the cases indicate that Title VII, as amended, holds public and private employers to the same standards. *Dothard v. Rawlinson, supra,* 433 U.S. at 331–32 n.14, 97 S.Ct. at 2728 n.14.

Although expressing doubt as to the constitutionality of Title VII thus interpreted, defendants recognize that this question, not having been raised in the district court, is not properly before us. *Id.* 433 U.S. at 323 n.1, 97 S.Ct. at 2724 n.1. *See,* for a discussion of the constitutional issue, *Blake v. City of Los Angeles,* 595 F.2d 1367, 1372–74 (9th Cir. 1979).

**18.** *Cf.* Uniform Guidelines, 29 C.F.R. § 1607.-14C(2) (1979); EEOC Guidelines, 29 C.F.R. § 1607.5(b)(3) (1971).

examination carries a greater burden of persuasion on the issue of job-relatedness. In affirming *Vulcan Society*, this Court enthusiastically adopted this sliding scale approach to content validity, explaining that taking the quality of test preparation into account in judging test validity would be useful in lessening "the risk that a court will fall into error in umpiring a battle of experts who speak a language it does not fully understand." *Vulcan Society, supra,* 490 F.2d at 396.

Although they never introduced a formal, written job analysis, defendants maintain that their method of preparation nevertheless ensured the content validity of the examinations.[19] Conspicuous by its absence from the preparation process, however, was a critical component of a proper job analysis as defined by Judge Weinfeld in *Vulcan Society*: observation of the actual performance of the typical officer's daily routine. The examination preparation process therefore fails to raise any inference that the content of the job was accurately reflected in the content of the examination.

At the hearing below the former director of examinations for the City's Department of Personnel testified that in his opinion the tests were content valid, but he offered no reasons in support of his position. In contrast, plaintiffs' expert, Dr. Richard S. Barrett, "was able to point with specificity to serious deficiencies in the content of the examinations." For example, Dr. Barrett viewed questions pertaining to "civic awareness," "space and figure relations," and "coding" as failing to test for the content of a police officer's job. *Guardians II,* 431 F.Supp. at 544. Most significantly, Dr. David Hall, called by *defendants,* agreed that questions in these same three areas did not test skills important to the job and did not warrant inclusion in the department's entry–level examinations.[20]

Attempting to establish the content validity of the challenged examinations by indirect as well as direct means, defendants contend that they were successful in developing a valid examination in 1973[21] and that the challenged examinations test for content areas comparable to the later, valid examination. Finding the second assertion to be inaccurate, the district court did not consider the first. Judge Carter found that the content of the later test varied "substantially" from that of the earlier ones. Defendants' conclusory representation that the acknowledged differences in content between the later examination and the challenged examinations are of no moment are simply unsupported by the evidence. Furthermore, defendants' contention that substantial percentage differences in content areas—conceded to exist between the challenged tests and the purportedly valid examination—are insignificant flies in the face of both intuition and precedent. As noted above, a content valid examination must not only test required skills and aptitudes,

---

**19.** The testimony of the former director of examinations for the Department of Personnel, as summarized by Judge Carter, makes it clear that while care was taken in the construction of the tests, no first–hand observation and analysis of the content of police work were undertaken.

> [T]he actual preparation of the examinations in issue encompassed review of files of previous tests; review of materials available in the library of the Bureau of Examinations; review of the Patrol Guide rules giving the procedures of the Police Department; contact with the Police Department concerning any special conditions warranting particular attention; the drafting of a notice of examination; and finally the construction of the actual test itself, using the various material described above.

*Guardians II,* 431 F.Supp. at 543 (footnote omitted). The more meaningful job analysis performed by the department in preparing a later test–No. 8155, administered in June of 1979–provides an interesting contrast. *See Guardians Association v. Civil Service Commission,* 630 F.2d 79 (2d Cir. 1980).

**20.** Dr. Hall was involved in the preparation of examination number 3014, administered in 1973 and not challenged on this appeal. *Guardians II,* 431 F.Supp. at 544.

Examples of the three categories of questions identified by both Dr. Barrett and Dr. Hall as not meriting inclusion in defendants' entry–level examinations are included in the Appendix.

**21.** *See* note 20, *supra.* Plaintiffs do not concede the validity of examination number 3014. *Guardians II,* 431 F.Supp. at 545 n.36.

it must test them "in proportion to their relative importance on the job . . . ." *Vulcan Society, supra,* 360 F.Supp. at 1274.

## 2. Criterion–Related Validity

Criterion–related validity studies correlate test scores with job performance. To establish the criterion–related validity of the challenged examinations, defendants introduced the testimony of Dr. William Weechun, a researcher at the New York City Board of Education, who had made a study demonstrating that the examinations employed between 1968 and 1970 were good predictors of success at the Police Academy for whites, blacks, and Hispanics. However, no attempt was made to correlate performance on the examinations or at the Academy with performance on the job.[22] Defendants contend that under *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), such a showing is unnecessary. Judge Carter properly rejected this contention.

In *Vulcan Society,* a case decided before *Washington v. Davis,* this Court recognized that in the absence of a showing that examinations testing performance at training school are themselves job–related, evidence that qualifying examinations predict performance on training school exams is "barren." 490 F.2d at 396 and n.11. *Accord, Pennsylvania v. O'Neill,* 348 F.Supp. 1084, 1090 (E.D.Pa.1972), *aff'd in pertinent part,* 473 F.2d 1029 (3d Cir. 1973); *United States v. City of Chicago,* 385 F.Supp. 543, 556 (N.D.Ill.1974); *Officers for Justice v. Civil Service Commission,* 371 F.Supp. 1328, 1337 (N.D.Cal.1973). Judge Carter's analysis of the instant case makes clear why that is so:

> Defendants' study demonstrates a high correlation between performance on the challenged examinations and performance at the Academy, but the task of correlating the examinations to actual performance as police officers remains unaccomplished. The respective positions of the parties would be unchanged if, for example, instead of giving these entry level examinations, the [NYPD] had enrolled the same group of individuals in the Academy. Because of the established correlation, standing on completion of training at the Academy would, presumably, approximate standing achieved at the entry level examinations. That is to say, a consistently higher proportion of whites than minorities would achieve passing grades, and a large majority of the highest achievers would be white. Accordingly, the greatest number of Academy graduates first hired would be white, and the greatest number of those first fired would be Academy graduates who are black and Hispanic. In a Title VII attack in that situation, plaintiffs' prima facie case would be established by showing, as here, the disproportionate impact of Academy procedures and testing on minorities. Defendants would be required to demonstrate that those testing practices are job–related, as they are required here to do in respect of the entry level examination. By introducing Academy performance as a correlate to the examinations, defendants cannot avoid their obligation to show job–relatedness.
>
> To provide that missing ingredient defendants would have this court find job–relatedness on the basis of a high correlation between the results of two separate testing practices, neither of which by itself has been validated according to accepted methods. We cannot accept this flawed argument.

*Guardians II,* 431 F.Supp. at 546–47. Nor can we.[23] Nor do we regard *Washington v.*

---

**22.** *Cf.* Uniform Guidelines, 29 C.F.R. § 1607.-15B(3) and (5) (1979); EEOC Guidelines, 29 C.F.R. § 1607.5(b)(3) and (4) (1971).

**23.** As the hearing testimony of former New York City Police Commissioner Patrick Murphy indicates, concern that success in training school may not necessarily be predictive of

success on the job is not confined to those unfamiliar with police work.

> Q. In your opinion, is there a correlation between performance in general at the Police Academy and performance on the street as a patrolman?
>
> A. I don't think there is a strong correlation, because once again, the tests at the Police Academy are in a classroom kind of

*Davis, supra,* as requiring us to ignore the degree to which adoption of defendants' position would undermine Title VII's goal of eliminating arbitrary barriers to the employment of minorities.

In *Washington v. Davis,* two unsuccessful applicants ("plaintiffs") [24] alleged that the recruiting procedures of the District of Columbia's metropolitan police force were racially discriminatory. Plaintiffs contended that these practices violated their rights under the due process clause of the Fifth Amendment, under § 1981, and under a section of the D.C.Code requiring that government jobs not be awarded or withheld on the basis of race or certain other specified factors. No violation of Title VII was alleged. One of the challenged practices was the use of "Test 21," a written examination developed by the Civil Service Commission and widely used throughout the federal service to test verbal, reading, and comprehension skills. To be accepted into the police training program an applicant was required to achieve a score of 40 out of 80 on Test 21 and to meet certain other physical and character standards. Plaintiffs made no claim of purposeful discrimination; they claimed only that Test 21 had a disproportionate impact and bore no relationship to job performance. The validity of Test 21 was the sole issue before the district court on cross motions for summary judgment.

The Supreme Court declined to hold "that the constitutional standard for adjudicating claims of invidious racial discrimination is identical to the standards applicable under Title VII . . . ." *Id.* 426 U.S. at 239, 96 S.Ct. at 2047. The Court ruled that unlike the more rigorous Title VII standard, the constitutional standard is concerned only with action reflecting a racially discriminatory purpose; disproportionate racial impact standing alone does not constitute a denial of equal protection.[25] Comparing the two approaches, the Court stated:

> Under Title VII, Congress provided that when hiring and promotion practices disqualifying substantially disproportionate numbers of blacks are challenged, discriminatory purpose need not be proved, and that it is an insufficient response to demonstrate some rational basis for the challenged practices. It is necessary, in addition, that they be "validated" in terms of job performance in any one of several ways, perhaps by ascertaining the minimum skill, ability, or potential necessary for the position at issue and determining whether the qualifying tests are appropriate for the selection of qualified applicants for the job in question. However this process proceeds, it involves a more probing judicial review of, and less deference to, the seemingly reasonable acts of administrators and executives than is appropriate under the Constitution where special racial impact, without discriminatory purpose, is claimed.

*Id.* at 246–47, 96 S.Ct. at 2051 (footnote omitted).

---

situation remote from the realities of street performance and I think those tests are weak indicators of what actual performance will be in the field.

\* \* \* \* \* \*

Satisfactory performance at the Police Academy . . . [is] dramatically different than field performance.

Mr. Murphy was formerly Commanding Officer of the Police Academy.

**24.** Although *Washington v. Davis, supra,* began as a challenge to the promotion policies of the District of Columbia police force, two blacks whose employment applications had been rejected by the department were permitted to intervene and to challenge its recruitment practices. Only the recruitment phase of the case was involved in the appeal to the Supreme Court. For the sake of simplicity, we have followed Judge Carter in referring to the *Washington v. Davis* intervenors as "plaintiffs."

**25.** "[T]he Due Process Clause of the Fifth Amendment contains an equal protection component prohibiting the United States from invidiously discriminating between individuals or groups." *Washington v. Davis, supra,* 426 U.S. at 239, 96 S.Ct. at 2047, *citing Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954). *See Fullilove v. Kreps,* 584 F.2d 600, 602 n.2 (2d Cir. 1978), *aff'd,* 441 U.S. 960, 99 S.Ct. 2403, 60 L.Ed.2d 1064 (1980), and cases cited therein.

After deciding the constitutional issue adversely to plaintiffs, the Court rejected plaintiffs' statutory arguments as well. Although the statutory section of the opinion, section III, is not free from ambiguity, we agree with Judge Carter that it does not govern the instant appeal. Viewing the "advisability" of a recruit training course as conceded, the Court termed it "apparent" that some minimal communicative skill would be "useful, if not essential, to satisfactory progress in the training regimen." *Id.* at 250, 96 S.Ct. at 2052. The Court concluded that it was a "sensible construction of the job–relatedness requirement" to hold "that a positive relationship between the test and training–course performance was sufficient to validate the former, wholly aside from its possible relationship to actual performance as a police officer." *Id.* at 250–51, 96 S.Ct. at 2052.

It is clear that although the parties and the lower courts had relied heavily on Title VII standards, Title VII was simply not applicable to the facts of *Washington v. Davis*. There is therefore good reason to think that the Court was not interpreting "job–relatedness" as defined by Title VII. Having stressed, in the paragraph quoted above, that the nature of a prima facie showing of discrimination under Title VII (*e. g.*, disproportionate impact) was irrelevant to the appeal before it, there was simply no reason for the Court to analyze the nature of the rebuttal contemplated by Title VII (*i. e.*, job–relatedness). The view that the Court was addressing solely the job–relatedness requirements of the Constitution, § 1981, and the D.C.Code rather than of Title VII is further supported by the lack of any discussion, in this portion of the opinion, of the language or legislative history of Title VII or of the testing guidelines promulgated by the EEOC. In our view it is most unlikely that the Court would have attempted to interpret a con-

cept so central to the operation of Title VII without consulting the usual sources. Therefore we conclude, as Justice Stevens emphasized in his concurring opinion:

> there is no Title VII question in this case. The actual statutory holdings are limited to 42 U.S.C. § 1981 and § 1–320 of the District of Columbia Code, to which regulations of the Equal Employment Opportunity Commission have no direct application.

*Id.* at 255, 96 S.Ct. at 2055 (Stevens, J., concurring). *See Blake v. City of Los Angeles*, 595 F.2d 1367, 1378–82 and n.17 (9th Cir. 1979), *cert. denied*, 446 U.S. 928, 100 S.Ct. 1865, 64 L.Ed.2d 281 (1980). ("If employers were permitted to validate selection devices without reference to job performance, then non–job–related selection devices could always be validated through the simple expedient of employing them at both the pre–training and training stage.") *See also* the Uniform Guidelines, 29 C.F.R. § 1607.14B(3) (1979), quoted in the margin.[26]

Even assuming that *Washington v. Davis* would govern the meaning of job–relatedness under Title VII, we think defendants misinterpret the intended scope of its holding. Dissenting from the Court's summary affirmance of *National Education Association v. South Carolina*, 434 U.S. 1026, 98 S.Ct. 756, 54 L.Ed.2d 775 (1978), Justice White, the author of the majority opinion in *Washington v. Davis*, rejected precisely the interpretation defendants urge upon us today.

> *Washington v. Davis*, 426 U.S. 229 [, 96 S.Ct. 2040, 48 L.Ed.2d 597] (1976), was thought by the District Court to have warranted validating the test in terms of the applicant's training rather than against job requirements; but *Washington v. Davis*, in this respect, held only that the test there involved, which sought to ascertain whether the applicant had the minimum communication skills neces-

---

**26.** Where performance in training is used as a criterion, success in training should be properly measured and the relevance of the training should be shown either through a comparison of the content of the training program with the critical or important work behavior(s) of the job(s), or through a demonstration of the relationship between measures of performance in training and measures of job performance.... Criterion measures consisting of paper and pencil tests will be closely reviewed for job relevance.

sary to understand the offerings in a police training course, could be used to measure eligibility to enter that program. The case did not hold that a training course, the completion of which is required for employment, need not itself be validated in terms of job relatedness. Nor did it hold that a test that a job applicant must pass and that is designed to indicate his mastery of the materials or skills taught in the training course can be validated without reference to the job. Tests supposedly measuring an applicant's qualifications for employment, if they have differential racial impact, must bear some "manifest relationship to the employment in question," *Griggs v. Duke Power Co.*, 401 U.S. 424, 432 [, 91 S.Ct. 849, 854, 28 L.Ed.2d 158] (1971), and it is insufficient for the employer "to demonstrate some rational basis for the challenged practices." *Washington v. Davis, supra*, 426 U.S. at 247 [, 96 S.Ct. at 2051].

*Id.* at 1027–28, 98 S.Ct. at 757.

It is important to keep in mind that in the instant appeal each plaintiff officer has been certified by the department to be both fully qualified to enter the police training program and fully qualified to join the force. Although the entry–level tests have in fact been demonstrated to disqualify disproportionate numbers of blacks and Hispanics, the black and Hispanic officers who brought this suit have all performed *at or above the level* set by the department itself. The *Guardians* plaintiffs do not challenge the establishment of a particular passing grade and indeed it is not clear that they would have standing to do so. They challenge only the use of their passing scores to determine the order in which they were offered employment.[27] Therefore, the *Washington v. Davis* argument–that the entry–level tests were justified by the need to weed out those applicants who lacked the minimal skills necessary to successful completion of the training program–is simply not available to the defendants on this appeal.

# III.

## APPLICABILITY OF TITLE VII: THE DATE OF THE LAST DISCRIMINATORY ACT

Having established in the district court that the challenged examinations were .indeed discriminatory within the meaning of Title VII, plaintiffs faced the task of demonstrating their entitlement to relief under the statute. This was no easy matter, for at every turn in the path between the injury and the remedy, defendants vigorously contested plaintiffs' right to proceed.

■ Two different questions of timing are crucial to plaintiffs' Title VII claim: to prevail thereon plaintiffs must demonstrate both that defendants violated the Act after its effective date and that plaintiffs filed a timely charge with the EEOC. *Acha v. Beame, supra*, 570 F.2d at 65. In order to establish each of these elements of their case, plaintiffs have attempted to show that defendants discriminated against them as late as October of 1974. Since Title VII was made applicable to municipalities in 1972, any discriminatory hiring practices engaged in by defendants as late as October of 1974 would clearly constitute post–Act conduct. Furthermore, the EEOC charge filed May 23, 1975, was timely filed under § 706(e) as to any Title VII violation occurring within the previous 300 days, that is, on or after July 27, 1974.[28] Predictably, defendants urge in response that their discriminatory conduct, if any, ceased prior to 1972 and, therefore, that plaintiffs have failed to prove that defendants engaged in any post–Act discriminatory practices which were made the subject of a timely EEOC charge. We cannot agree.

The district court held that the department's reliance on eligibility lists reflecting performance on discriminatory examinations constituted a program of discriminato-

27. *See* Uniform Guidelines, 29 C.F.R. § 1607.- 5G. *See*, on rank order hiring issue, *Guardians Association v. Civil Service Commission, supra*, 630 F.2d 79 (2d Cir. 1980).

28. *See* note 7, *supra*.

ry hiring which terminated only when the last person was hired off the lists–that is, in October of 1974. Only then, in the court's view, did the department cease its unjustified refusals to hire minorities.[29] Defendants concede, as they must, that as a general rule discriminatory refusals to hire are prohibited by Title VII.[30] *See Weise v. Syracuse University,* 522 F.2d 397, 409 (2d Cir. 1975). They contend however that the "operative" event in the hiring procedure under scrutiny, the relevant event for purposes of deciding when the unlawful discrimination occurred, was the *promulgation* of the eligibility lists reflecting the applicants' scores on the challenged exams. Defendants assert that since all the challenged examinations were administered and the corresponding lists were promulgated prior to the date Title VII became applicable to municipalities, the giving of the tests and the compilation of the eligibility lists are acts falling outside the scope of the statute. Defendants dismiss as a "fiction" the district court's view that the department's conceded *utilization* of these lists for purposes of making hiring decisions as late as 1974 in itself constituted a post–Act violation of Title VII. Defendants maintain that under

**29.** In assessing the timeliness of plaintiffs' efforts to seek relief for the injuries suffered as a result of defendants' hiring procedures, the district court appears to have implicitly determined (1) that placement on the eligibility lists alone governed date of hiring and (2) that the last hiring from the challenged lists occurred in October of 1974. Defendants now challenge the accuracy of the first proposition and the relevance of the second. Conceding that the last class member was not hired until October of 1974, defendants contend in a rather conclusory manner that their discriminatory conduct ceased, at the latest, when the last members of the plaintiff class were *notified* that they were to be offered employment. This argument deserves only brief mention as it has not been properly preserved for appeal.

While claiming that this argument was raised below, defendants point only to the following excerpt from the memorandum of law they submitted to the district court on remand:

There is no factual basis to support plaintiffs' contention that the hiring in September and October 1974 from the pre–1972 eligible lists resulted from lower placement on those lists because of relatively poor performance on the examination. In fact, all of the lists had been completely canvassed prior to December 15, 1973, and the deferral of appointments until after that time was a consequence of a variety of factors other than relative position on the list.

Whether the lists were in fact completely canvassed prior to December 15, 1973, and whether certain appointments were deferred until 1974 solely for reasons unrelated to rank on the discriminatory lists are questions of pure fact and our scope of review is therefore quite limited. Defendants have failed even to reveal at what point in the proceedings below, if ever, they went so far as to specify for Judge Carter the precise nature of these nonculpable factors, cryptically alluded to as a "variety." Nor have we been told what evidence, if any, was offered below to support the bold assertion that but for these alleged other factors, all members of the plaintiff class would have been hired by 1973, although any such evidence has presumably been in the possession of the department for seven years. Compare *Acha v. Beame,* 438 F.Supp. 70, 76 (S.D.N.Y.1977), *aff'd,* 570 F.2d 57 (2d Cir. 1978), another employment discrimination suit involving the NYPD in which the City defendants submitted "uncontradicted proof" that certain plaintiffs declined offers of employment.

Under the circumstances, we cannot fault Judge Carter for making no explicit finding on this point, nor can we overturn as clearly erroneous his implicit finding—that the refusals to hire were attributable to the discriminatory nature of defendants' employment practices rather than to independent and non–culpable factors.

**30.** *See* § 703(a)(1), quoted in note 4, *supra.*

The fact that all members of the plaintiff class were eventually hired by the department does not mean, of course, that they cannot challenge the department's discriminatory refusal to hire them at an earlier date. There is no reason why the acceptance of a belated offer of employment should be deemed a waiver of the right to seek redress for a discriminatory delay. Although the practice complained of in the case at bar might perhaps more appropriately be designated "discriminatory delay in hiring," in our view the "refusal to hire" rubric is broad enough to include refusals followed by delayed acceptances.

Because the plaintiff class is composed exclusively of applicants who were ultimately, albeit belatedly, successful in obtaining employment, we express no view on issues of concern only to those applicants who failed the challenged examinations and were never placed on an eligibility list. *See Gautam v. First National City Bank,* 425 F.Supp. 579 (S.D.N.Y.1976), *aff'd,* 573 F.2d 1290 (2d Cir. 1977), *cert. denied,* 440 U.S. 919, 99 S.Ct. 1241, 59 L.Ed.2d 470 (1979) (timeliness of EEOC filing in refusal to hire case).

Title VII the fact that, until they were exhausted, the lists determined the order in which all appointments were made constituted merely the non–actionable perpetuation of the effects of past, non–actionable discrimination.

### A. Refusal to Hire as a Violation of Title VII

■■■■ Defendants argue that "the claims of discriminatory refusal to hire presented here clearly depend upon 'a past event which has no present legal significance.'" Reply brief at 5, quoting United Air Lines, Inc. v. Evans, 431 U.S. 553, 560, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977). Defendants wish, understandably, to accentuate their pre–Act conduct and trivialize their post–Act conduct, but logic and precedent preclude acceptance of defendants' assessment of the legal significance of their actions. We need not decide whether the giving of the tests and the compilation of the lists in themselves constituted the infliction of an actionable injury,[31] for the results of the tests were in effect being "used to discriminate," in direct contravention of § 703(h) of Title VII,[32] each time a member of the plaintiff class was denied a chance to fill a vacancy. By utilizing the tainted test results for years after becoming subject to the commands of Title VII, defendants continued a course of discriminatory conduct that had indeed begun before the effective date of the Act but did not cease until defendants abandoned the practice of making hiring decisions in this manner.[33] Even if the unjustified refusals to hire did not

comprise the core of defendants' discriminatory conduct, at the very least they represented the culmination of a continuously maintained illegal employment policy. Acha v. Beame, supra, 570 F.2d at 65. And it is settled law that the limitation period determining the timeliness of a complaint filed as to such a policy is measured from the last occurrence of an instance of that policy. Id.

Acha v. Beame provides a close and instructive parallel. In that action female police officers who, like the original Guardians II plaintiffs were laid off by the NYPD in 1975 sued under Title VII and various other federal laws, alleging that the last–hired, first–fired layoffs were discriminatory in light of the fact that women had been prevented from obtaining seniority because of the department's past discrimination in hiring. Acha v. Beame, 401 F.Supp. 816 (S.D.N.Y.1975). The department's alleged discrimination against women stemmed not from the use of invalid examinations, as in the Guardians action, but rather from the maintenance of separate eligibility lists for male and female applicants and the imposition of a quota on the hiring of women. Despite this difference in the precise form of the alleged discrimination in hiring, in both Guardians and Acha the conduct complained of was the refusal, in the absence of any business justification, to hire in a timely manner members of the protected plaintiff group.

On remand,[34] the district court in Acha, taking into account the Supreme Court's

---

31. In support of their contention that the statute of limitations began to run, at the latest, upon the promulgation of the eligibility lists, defendants cite the companion cases of Martin v. Ronan, 44 N.Y.2d 374, 405 N.Y.S.2d 671, 376 N.E.2d 1316 (1978), and Mundy v. Nassau County Civil Service Commission, 44 N.Y.2d 352, 405 N.Y.S.2d 660, 661, 376 N.E.2d 1305, 1306 (1978). These decisions are inapposite. In these cases, the New York Court of Appeals was concerned solely with interpreting the four month statute of limitations governing proceedings against administrative bodies or officers under Article 78 of New York's Civil Practice Law and Rules. See C.P.L.R. § 217 (McKinney's). As Title VII was not at issue, the New York court had no occasion to decide whether

a refusal to hire based on adherence to an eligibility list developed from the results of a discriminatory employment test is in itself a violation of Title VII that will set the statute of limitations running.

32. See note 6, supra.

33. The lists based on the 1968 to 1970 tests challenged in this action have been exhausted. We of course express no opinion as to the lawfulness of any hiring decisions made on the basis of subsequent tests and lists.

34. Deciding the first Acha appeal without the benefit of the Supreme Court's decision in Teamsters and demonstrating little prescience, we held:

then recent decisions in *Teamsters* and *United Air Lines, Inc. v. Evans, supra,* stated:

> I find that with respect to hiring practices, the discriminatory act occurs when a male police officer is hired instead of a female who meets all requirements for appointment and has a higher test score. Any class member who can demonstrate that such hirings occurred within the 300 days prior to [the filing of the EEOC charge] may succeed.
>
> \* \* \* \* \* \*
>
> [T]he *Teamsters* holding requires that the discrimination have taken place after the effective date of Title VII, which in the case of municipal employees is March 24, 1972. Pre–Act discrimination which is perpetuated by a neutral seniority system is immunized from Title VII attack by reason of section 703(h). . . . To fall outside the immunity afforded to a bona fide seniority system, plaintiffs must show more than the system's failure to correct pre–Act discrimination.
>
> Thus, the June 1975 layoffs pursuant to a facially neutral seniority system were immunized and cannot be the basis for a Title VII violation. Therefore, plaintiffs . . . to succeed must establish a prima facie case of a Title VII violation which occurred after the effective date of the Act and within the period of the statute of limitations. Thereafter, any class member who was not hired until after March 24, 1972 and, but for her sex

would have been hired earlier than her actual appointment date, is entitled to a seniority revision.

438 F.Supp. 70, 75–77 (S.D.N.Y.1977) (citations omitted).

On appeal after remand in *Acha*, this Court gave its approval to the district court's articulation of the plaintiffs' burden:

> To succeed at trial, then, the appellants would have to be able to demonstrate a Title VII violation occurring after the effective date of the Act, and within the period of the statute of limitations. Such a violation would occur if, absent discrimination, a woman would have been hired earlier than her actual date of appointment.

570 F.2d 57, 61 (2d Cir. 1978).

*Acha* makes clear that an unjustified refusal to hire is in itself a violation which cannot be dismissed as a mere effect of an earlier wrong. Defendants have advanced no persuasive basis for distinguishing *Acha*. In particular, their reliance on *United Air Lines, Inc. v. Evans* is doubly misplaced. First, as is obvious from our citation to the case in our *Acha* opinion, we were aware of the Supreme Court's holding in *Evans* and, of course, fashioned our decision accordingly. 570 F.2d at 60 n.4, 63–64. Second, *Evans* presented a fact situation entirely different from that presented in the instant case.[35] Nothing in *Evans* supports the notion that a refusal to hire within the 300 day period preceding the filing of an EEOC

---

> If a female police officer can show that, except for her sex, she would have been hired early enough to accumulate sufficient seniority to withstand the current layoffs, then her *layoff* violates section 703(a)(1) of Title VII, 42 U.S.C. § 2000e–2(a)(1), since it is based on sexual discrimination.

*Acha v. Beame,* 531 F.2d 648, 654 (2d Cir. 1976) (emphasis added). On remand in *Acha,* the district court properly recognized that *Teamsters* had foreclosed this approach to the case. 438 F.Supp. 70, 76 (S.D.N.Y.), *aff'd,* 570 F.2d 57 (2d Cir. 1978).

**35.** *United Air Lines, Inc. v. Evans,* 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977), concerned a flight attendant who was forced to resign in 1968 because of the airline's no–marriage policy. Evans was rehired in 1972, after the policy

had been dropped, but United refused to credit her with seniority accrued during her earlier service. The Supreme Court held that United was entitled to treat the forced resignation as lawful after Evans failed to file a timely charge with the EEOC in 1968, explaining that "[a] discriminatory act which is not made the basis for a timely charge is the legal equivalent of a discriminatory act which occurred before the statute was passed." *Id.* at 558, 97 S.Ct. at 1889. Since the seniority system in itself was not discriminatory, the Court rejected Evans' contention that a continuing violation had been demonstrated. "[T]he emphasis should not be placed on mere continuity; the critical question is whether any present *violation* exists." *Id.* (emphasis in original).

charge may not properly be viewed as a current manifestation of a continuing violation.

Therefore, we hold that the district court properly rejected the view that the department's discriminatory refusals to hire were merely effects of earlier discriminatory conduct.[36] Furthermore, we hold that the district court properly declined to limit relief to those plaintiffs who were wrongfully refused employment within the critical 300 day period. *Guardians III*, 466 F.Supp. at 1279–80. These refusals were not discrete acts; they were carried out pursuant to a conceded and consistent policy. All plaintiffs injured by the department's post–Act adherence to that policy are therefore entitled to relief.

A continuously maintained illegal employment policy may be the subject of a valid complaint until a specified number of days after the last occurrence of an instance of that policy. *Wetzel v. Liberty Mutual Insurance Co.*, 508 F.2d 239, 246 (3d Cir.), *cert. denied*, 421 U.S. 1011 [, 95 S.Ct. 2415, 44 L.Ed.2d 679] . . . (1975); *Macklin v. Spector Freight Systems, Inc.*, [156 U.S.App.D.C. 69, 76–80], 478 F.2d 979, 986–90 (1973). See also 118 Cong.Rec. 7565 (March 6, 1972). Furthermore, where an illegal policy is so maintained, relief for injuries sustained even before the beginning of the limitations period is appropriate.

*Acha v. Beame, supra*, 570 F.2d at 65. See *Egelston v. State University College at* *Geneseo*, 535 F.2d 752 (2d Cir. 1976); *Kohn v. Royall, Koegel & Wells*, 59 F.R.D. 515, 518–19, 523 (S.D.N.Y.1973), *appeal dismissed*, 496 F.2d 1094 (2d Cir. 1974).

### B. *Bona Fide Merit System*

Defendants contend that even if their refusals to hire would otherwise constitute violations of the Act, § 703(h) of Title VII protects them from liability for their post–Act utilization of the lists.[37] Section 703(h) immunizes from challenge the application by an employer of a bona fide seniority or merit system. Defendants view it as indisputable that the certification of candidates in rank order from an eligibility list for appointment in accordance with the Civil Service Law of New York State[38] constitutes the application of a "bona fide merit system" and that therefore, because of the § 703(h) exemption, the use of the lists cannot be declared an unlawful practice under Title VII.

It is by no means clear that the "merit system" language of § 703(h) applies to hiring practices. The first sentence of § 703(h) is made up of two major clauses, the first, which we have italicized, dealing with bona fide seniority and merit systems, the second dealing with professionally developed ability tests.

> *Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or*

---

**36.** Perhaps anticipating our determination that plaintiffs have demonstrated a continuing violation of Title VII as to which a timely charge was filed, defendants invoke the doctrine of laches with much feeling but little supporting authority. *Fatal to this attempt is defendants'* failure to allege or prove any prejudice in the defense of their case. *Compare Boone v. Mechanical Specialities Co.*, 609 F.2d 956 (9th Cir. 1979), *with Bernard v. Gulf Oil Co.*, 596 F.2d 1249, 1256 (5th Cir. 1979), *and EEOC v. Westinghouse Elec. Corp.*, 592 F.2d 484 (8th Cir. 1979). In fact defendants have been on official notice of the suspect nature of their hiring procedures at least since 1973, when we noted that the Rand Report had "confirmed plaintiffs' contention that the entry examinations had had a racially disproportionate impact." *Guardians II*, on appeal, 490 F.2d at 402.

**37.** Conceding that they neglected to bring the "merit system" language of § 703(h) to the attention of the district court, defendants nevertheless urge us to consider their interpretation of § 703(h) for the light it sheds on a contention they did raise below, that is, that the department's rank order hiring scheme was a "neutral system" rather than a violation of Title VII. Because it would be an empty exercise to attempt to judge the lawfulness of defendants' hiring procedures without considering all the pertinent sections of Title VII, we have addressed ourselves to this belatedly offered argument.

**38.** *See* N.Y.Const. art. V, § 6; N.Y. Civil Service Law §§ 50, 56 and 61 (McKinney).

*privileges of employment pursuant to a bona fide seniority or merit system, or a system which measures earnings by quantity or quality of production or to employees who work in different locations, provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin,* nor shall it be an unlawful employment practice for an employer to give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results is not designed, intended or used to discriminate because of race, color, religion, sex or national origin.

42 U.S.C. § 2000e–2(h) (emphasis added). In response to defendants' invocation of § 703(h) as immunizing use of a *hiring* list, plaintiffs contend that the term "merit system," like the companion term "seniority system," is generally understood to refer to a system whereby an employer rewards employees, pursuant to a regularized plan, for performance which has been superior in terms of length or quality. Plaintiffs also see significance in the use of the terms "seniority system" and "merit system" to refer solely to post–employment compensation practices in the Equal Pay Act of 1963, 29 U.S.C. § 206(d)(1). *See Corning Glass Works v. Brennan,* 417 U.S. 188, 199, 94 S.Ct. 2223, 2230, 41 L.Ed.2d 1 (1974). Plaintiffs contend that defendants have failed to uncover anything in either the wording of § 703(h) or its legislative history to suggest that Congress intended the phrase "seniority or merit system" to be understood, contrary to common usage and usage in prior legislation, to refer to pre–employment and hiring practices as well as post–employment practices. In addition, pointing out that § 703(a) of Title VII specifically identifies discriminatory refusal to hire as a prohibited practice *in addition* to discrimination in terms, conditions or privileges of employment, plaintiffs argue that the omission of any "refusal to hire" language in § 703(h) is indicative of the narrower scope of the latter section.

Although we do not minimize the appeal of plaintiffs' argument on this point, *but see Dickerson v. United States Steel Corp.,* 472 F.Supp. 1304, 1323–26 (E.D.Pa. 1978), we need not decide today ·whether the term "merit system" in § 703(h) encompasses hiring practices. Assuming for present purposes that it does, it is clear that a hiring system that ranks applicants according to their performance on discriminatory examinations cannot claim the status of a "bona fide merit system" within the meaning of the statute.

Under the second, or "testing," clause of § 703(h), action based on the results of employment tests may not lawfully be "used to discriminate." At least since *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), it has been absolutely clear that testing practices are judged by their impact as well as their intent. Nevertheless, defendants contend that the practice of hiring on the basis of the results of pre–employment testing is a "bona fide merit system" which is protected by the first clause of § 703(h) regardless of impact, unless the system was purposefully *designed* to discriminate.

Under defendants' interpretation of § 703(h), any employer who administered a discriminatory entry–level examination before March of 1972 could lawfully base hiring decisions on the results of that examination *indefinitely.* As is urged in the instant case, an employer could, with impunity, refuse to hire in a timely manner hundreds of minority applicants, solely because of performance on an invalid test, years after Title VII explicitly forbade the *use* of testing results to discriminate in hiring. Read in such a fashion the first clause of § 703(h) would effectively break the promise held out in the second clause–the promise that as of the effective date of the Act, artificial barriers to the employment of minorities would be dismantled. Defendants hazard no guess as to why Congress would have taken such a Januslike approach to the subject of testing.

Defendants contend that *International Brotherhood of Teamsters v. United States,*

431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), requires us to read § 703(h) in this improbable manner. *Teamsters*, they argue, defined a bona fide seniority system as one not *designed* to be discriminatory. By analogy, defendants insist, a merit system not *designed* to be discriminatory must also pass muster as bona fide. In our view, this argument slides over a rather crucial distinction. There was no contention in *Teamsters* that the seniority system under scrutiny did not measure precisely what it purported to measure, that is, the length of time a given employee had been on the job. The measurement of length of employment was race–neutral: a white employee and a black employee hired on the same day would have the same seniority and the same attendant privileges and benefits. While such a system in a sense locked in the effects of past discrimination in hiring, the system itself was non–discriminatory.

Unlike the seniority system in *Teamsters*, the merit system in the instant case does not measure what it purports to measure. The failing of the department's hiring system is therefore not that it perpetuates *the effects* of past discrimination, but rather that it perpetuates discrimination. It is one thing to utilize a system that locks in the effects of past discriminatory hiring decisions; it is a very different thing to lock in a discriminatory method of making hiring decisions. Once it has been determined that an examination has a disproportionate impact on minority groups and that it is not job–related, one cannot logically characterize a system of hiring solely on the basis of the results of the test as a "merit" system— for whatever the test does measure it does not have merit: it does not measure fitness for the job in question, which is surely the only logical meaning of the term "merit" in the hiring context. Section 703(h) makes sense only if the term "bona fide merit system" is understood to refer to merit in areas related to the necessities of the business, not "merit" in the abstract. Nothing in *Teamsters* implies that by labelling a non–job–related system of employee selection a "merit" system, an employer can avoid the command of Title VII that it

henceforth select its workforce in a non–discriminatory fashion. Compare *California Brewers Association v. Bryant*, 444 U.S. 598, 100 S.Ct. 814, 821, 63 L.Ed.2d 55 (1980) (upholding seniority system):

> What has been said does not mean that § 703(h) is to be given a scope that risks swallowing up Title VII's otherwise broad prohibition of "practices, procedures and tests" that disproportionately affect members of those groups that the Act protects. Significant freedom must be afforded employers and unions to create differing seniority systems. But that freedom must not be allowed to sweep within the ambit of § 703(h) employment rules that depart fundamentally from commonly accepted notions concerning the acceptable contours of a seniority system, simply because those rules are dubbed "seniority" provisions or have some nexus to an arrangement that concededly operates on the basis of seniority.

Therefore, again assuming arguendo that the merit system language of § 703(h) applies to pre–employment testing, we must agree with those courts that have applied the *Griggs* impact and job–relatedness standards to test the bona fides of a challenged "merit" hiring system. *See Dickerson v. United States Steel Corp., supra,* 472 F.Supp. at 1323–26; *League of United Latin American Citizens v. City of Santa Ana,* 410 F.Supp. 873, 910 n.28 (C.D.Cal.1976) ("Suffice it to say that a system which relies on discriminatory devices not based on a business necessity is not a 'bona fide' 'merit' system. . . . The Act does not give rights with one hand and take them away with the other.") *But cf. United States v. City of Chicago,* No. 73C 661 (N.D. Ill., Oct. 17, 1979) (where post–employment "merit system" promotion list developed from pre–Act test was challenged, burden on plaintiffs to show lack of job–relatedness). Defendants have cited no case in which § 703 has been held to immunize post–Act hiring on the basis of an eligibility list reflecting performance on pre–Act discriminatory examinations. In the absence

of any guideposts pointing that way, we decline to blaze a trail in that direction.[39]

Racial discrimination in employment is one of the most deplorable forms of discrimination known to our society, for it deals not with just an individual's sharing in the "outer benefits" of being an American citizen, but rather the ability to provide decently for one's family in a job or profession for which he qualifies and chooses. Title VII of the 1964 Civil Rights Act provides us with a clear mandate from Congress that no longer will the United States tolerate this form of discrimination. It is, therefore, the duty of the courts to make sure that the Act works . . . .

*Culpepper v. Reynolds Metals Co.*, 421 F.2d 888, 891 (5th Cir. 1970).

For the foregoing reasons we affirm Judge Carter's ruling on plaintiffs' Title VII claim.

### IV.

### TITLE VI

Because the particular types of relief granted under Title VII could not properly take into account any period of time prior to March 24, 1972, the effective date of Title VII as applied to municipalities, the district court turned to plaintiffs' Title VI claim in order to determine whether addi-

tional relief was available.[40] After ruling that there exists an implied private cause of action under Title VI,[41] Judge Carter held that like Title VII, Title VI prohibits not only intentionally discriminatory conduct but also practices and policies having "a disparate impact on minorities for which there is no countervailing justification." *Guardians III*, 466 F.Supp. at 1285.

Although we are unanimous in our determination that the district court's grant of relief under Title VI must be reversed, the three members of this panel have taken two different paths to that result. The remainder of section IV of this opinion represents only the view of the author. Judge Coffrin's concurring opinion, in which Judge Kelleher has joined, represents the opinion of the Court on the Title VI issue presented by this appeal.

Having determined that there was liability under Title VI, the district court turned to the question of relief:

Since the substantive standard for illegal employment discrimination is the same under Title VI as it is under Title VII, and all forms of traditional equitable relief are available under Title VI, it seems logical to adopt the body of remedial law already developed under Title VII. Similar kinds of remedies should apply unless they would conflict with some purpose peculiar to Title VI. . . .

**39.** We have found nothing in the legislative history of § 703(h) that would support plaintiffs' interpretation. As the Supreme Court has noted, the section was added to the bill in response to fears that Title VII would destroy existing seniority rights. *Teamsters, supra*, 431 U.S. at 350–53, 97 S.Ct. at 1862–63; *Franks v. Bowman Transportation Co.*, 424 U.S. at 758–62, 96 S.Ct. 1251, 1261–63, 47 L.Ed.2d 444. During the debate preceding the adoption of § 703(h) Senators Clark and Case–the "bipartisan captains" responsible for Title VII–placed an interpretative memorandum in the Congressional Record dealing with the seniority issue. The memorandum stated that as it was, before the addition of § 703(h), Title VII would not affect established seniority rights. The final sentence of the memorandum read:

> However, where waiting lists for employment or training are, prior to the effective date of the title, maintained on a discriminatory basis, the use of such lists after the title takes

effect may be held an unlawful subterfuge to accomplish discrimination.

110 Cong.Rec. 7213 (1964), quoted in *Franks v. Bowman Transportation Co., supra*, 424 U.S. at 759 n.15, 96 S.Ct. at 1262 n.15. There is no indication in the subsequent history of the bill that § 703(h) was intended to be inconsistent with this understanding. Thus, although it is admittedly not conclusive one way or the other, in our view the legislative history of § 703(h) provides no support for defendants' interpretation.

**40.** Municipalities have been subject to Title VI since the effective date of the Civil Rights Act of 1964. The earliest of the examinations challenged in the instant action was administered in 1968. Hence, all the discriminatory conduct alleged in this action is post–Title VI.

**41.** The pertinent provisions of Title VI are set out in notes 47 and 48, *infra*.

Although the statutory predicate has changed, there is no reason for the relief provided here to be any less comprehensive than that previously ordered in *Guardians II.*

*Id.* at 1287 (footnote omitted).

I must disagree. In my view, the compensatory remedies sought by and awarded to plaintiffs in the case at bar are not available to private litigants under Title VI. I therefore view it as unnecessary to decide today whether there is a private cause of action for other types of relief under Title VI and, if so, whether this action was timely brought.[42]

### A. The Nature of the Remedy

In the recent case of *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979), the Supreme Court made two points pertinent to the issue before us. First, the Court reemphasized that the existence of a private cause of action is not so much a question of wisdom as it is one of congressional intent, assuming for purposes of argument that the two may, on occasion, differ.

The question whether a statute creates a cause of action, either expressly or by implication, is basically a matter of statutory construction. . . . While some opinions of the Court have placed considerable emphasis upon the desirability of implying private rights of action in order to provide remedies thought to effectuate the purposes of a given statute,

. . . what must ultimately be determined is whether Congress intended to create the private remedy asserted . . . .

*Id.* at 15, 100 S.Ct. at 245 (citations omitted).

Second, *Transamerica* illustrates that implication of a private right of action is not necessarily an all or nothing undertaking. The proper inquiry is two–fold: did Congress intend to create a private right of action and, if so, what were the intended limits on this private right of action. Thus in *Transamerica*, although recognizing a limited private remedy under the Investment Advisors Act of 1940 to void contracts made in violation of the statute, the Court held that the Act conferred no other private causes of action. Because *Transamerica* counsels us to consider not only the existence but the scope and nature of any private right of action that may have been created by Congress, it is necessary to focus on the remedies requested and awarded in this case before considering whether Congress intended to confer on private parties the right to bring this particular type of action under Title VI.

Much of the relief granted by the district court was intended to compensate plaintiffs for their being hired later than they would have been but for the defendants' discriminatory practices. The district court expressly attempted to make plaintiffs whole, insofar as is possible, for past losses and injuries.[43] Toward this end, Judge Carter

---

42. I regret that my colleagues have found it necessary to decide the difficult issue of the proper standard to be applied under Title VI–intent or impact—in a case where plaintiffs, in my view, are not entitled to the relief sought under either interpretation of the statute. Because of the ubiquitousness of federal funding, resolution of the intent vs. impact question will affect the rights and obligations of millions of applicants for and beneficiaries of a wide variety of federal programs. An issue of this magnitude merits resolution in a case where it is properly presented. For these reasons, I regard it as preferable to reverse on the narrower ground that the relief sought is not available under Title VI, whatever the proper standard, even though this remedial issue has not been addressed by either party on appeal.

43. For lack of a better term, in this opinion I have used the phrase "compensatory relief" to describe those remedies, including money damages, the purpose of which is to make plaintiffs whole for injuries suffered in the past rather than to correct a present wrong or prevent a future one. Because the discrimination against plaintiffs alleged in this action ceased in 1974, I regard the awards of constructive seniority (with corresponding salary increases), back pay and back benefits to be retrospective and compensatory.

The district court's injunction provided for non–compensatory relief as well as compensatory relief. Thus, in addition to the above, the court ordered that a new sergeants examination be given to now–qualified officers who had been disqualified from taking earlier sergeants examinations due to their lack of seniority.

ordered as a first step that all class members be assigned constructive seniority dates, which were to be calculated pursuant to a formula spelled out by the court. With respect to the period during which they would have been employed had they been hired on their constructive seniority dates, plaintiffs were apparently to be awarded back pay,[44] with interest, and reimbursement for certain medical and insurance disbursements.

The parties have referred us to no case in which compensatory relief has been awarded under Title VI, nor has my own research disclosed any.[45] In fact, I have located only three cases that address the issue. In *Rendon v. Utah State Department of Employment Security Job Service*, 454 F.Supp. 534 (D.Utah 1978), the court held squarely that Title VI does not provide a plaintiff with a private cause of action for damages in an employment discrimination action, while noting in contrast that "in proper instances private parties can indeed maintain an action under Title VI in a role that could loosely but accurately be described as that of private attorneys general," *citing Lau v. Nichols*, 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974), *inter alia*.

> The nature of such an action, however, differs markedly from the instant action. Here plaintiff is not attempting to directly enforce compliance with Title VI, nor is he seeking declaratory or injunctive relief. Rather, plaintiff is seeking compensation . . . for [an] alleged injury . . . .

Furthermore, "[i]n an effort to insure that future hiring practices are nondiscriminatory and valid," the defendants were ordered to meet and consult with plaintiffs, their counsel and their experts regarding the preparation and use of examinations to be given over the next two years. In my view, the district court's findings and conclusions in regard to plaintiffs' Title VII claim fully justified the award of this non-compensatory and prospective relief and we therefore need not decide today if such relief is similarly available in private suits under Title VI. Plaintiffs seek no additional relief on appeal.

**44.** The intention of the district court with respect to back pay is not clear from the order entered below. *See* section VI of this opinion.

*Rendon v. Utah State Department of Employment Security Job Service, supra*, 454 F.Supp. at 536.

In *Gilliam v. City of Omaha*, 388 F.Supp. 842 (D.Neb.), *aff'd*, 524 F.2d 1013 (8th Cir. 1975), the district court took a different view, expressing the opinion, in dictum, that a private action for damages might be maintained under Title VI. *Accord, Quiroz v. City of Santa Ana*, 18 FEP Cas. 1138 (C.D.Cal. Aug. 29, 1978) (dictum). In affirming the district court's judgment for the defendants in *Gilliam*, on the ground that plaintiff had failed to prove the employment discrimination she had alleged, the Eighth Circuit did not discuss the question of remedies. In *Chambers v. Omaha Public School District*, 536 F.2d 222 (8th Cir. 1976), another employment discrimination suit brought under Title VI, *inter alia*, the action was barred by the applicable statutes of limitations. Noting that "[t]he issue of whether a monetary judgment can be obtained under Title VI has not been definitively resolved," the court expressed "no view on the propriety of permitting money judgments in § 2000d actions." *Id.* at 225 n.2.

It appears then that in the sixteen years since the passage of Title VI, those courts that have either assumed or held that a private action may be brought under the statute have uniformly granted only declaratory or injunctive relief aimed at bringing defendants into compliance with Title VI, in

**45.** In *Wade v. Mississippi Cooperative Extension Service*, 528 F.2d 508 (5th Cir. 1976), employees and patrons of the defendant organization sued under the Fifth and Fourteenth Amendments, Title VI, and 42 U.S.C. §§ 1981, 1982 and 1983, alleging discrimination in employment and in delivery of services. Declaratory and injunctive relief was upheld on appeal but the district court's initial award of back pay, 372 F.Supp. 126 (N.D.Miss.1974), was vacated. On remand the district court again held that certain defendants would be liable for money damages, 424 F.Supp. 1242 (N.D.Miss. 1976). Although the matter is not free from doubt, it appears from the various opinions in *Wade* that back pay was awarded under §§ 1981 and 1983 rather than under Title VI.

effect focusing on the correction of present wrongs and the prevention of future violations and as a practical matter leaving past injuries unredressed. *See, e. g., Regents of the University of California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) (defendants ordered to admit plaintiff excluded from medical school under admissions system held violative of Title VI; compensation for wrongful delay of presumably lucrative practice not discussed and apparently not sought). In *Lau v. Nichols,* 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974), a class suit against school officials in which non–English–speaking Chinese students sought relief from allegedly unequal educational opportunities, plaintiffs urged no specific remedy on the courts. Relying solely on Title VI, the Supreme Court reversed the denial of relief below, suggesting by implication that the appropriate relief would be prospective and corrective rather than compensatory:

> Teaching English to the students of Chinese ancestry who do not speak the language is one choice. Giving instructions to this group in Chinese is another. There may be others. Petitioners ask only that the Board of Education be directed to apply its expertise to the problem and rectify the situation.

*Id.* at 565, 94 S.Ct. at 787.

The approach has been the same in the courts of appeals. It appears that in all the circuits the relief granted in Title VI cases is generally aimed at bringing defendants into compliance with Title VI rather than compensating plaintiffs for past violations. *See, e. g., Uzzell v. Friday,* 591 F.2d 997 (4th Cir. 1979) (declaring invalid under Title VI certain race–related regulations at state college) (subsequently reargued and remanded by en banc court for fuller development of the record, *Uzzell v. Friday,* 625 F.2d 1117 (4th Cir. 1980)); *Serna v. Portales Municipal Schools,* 499 F.2d 1147 (10th Cir. 1974) (ordering school system to implement plan under which special needs of Spanish–surnamed students would be taken into account); *Bossier Parish School Board v. Lemon,* 370 F.2d 847 (5th Cir.), *cert. denied,* 388 U.S. 911, 87 S.Ct. 2116, 18 L.Ed.2d 1350 (1967) (ordering submission of desegregation plan by school board).

Although plaintiffs' inability to point to a precedent for the award of compensatory relief under Title VI is not dispositive, the apparently uniform approach of the courts over the many years since the passage of Title VI counsels us to scrutinize with particular care the claim that such relief is indeed contemplated by the statute.[46]

B. *Implication of a Private Cause of Action for Compensatory Relief.*

As a preliminary matter, it should be noted that although private litigants have brought suit under Title VI on a number of occasions, the Supreme Court has not yet definitively declared whether any private cause of action under Title VI should be implied. The several opinions written in *Bakke* indicate that Chief Justice Burger and Justices Stevens, Stewart and Rehnquist would imply a private action under Title VI and that Justice White would not. Justices Powell, Marshall, Blackmun, and Brennan declined to address "this difficult issue," which had been neither argued nor decided in the courts below. *Cf. Burks v. Lasker,* 441 U.S. 471, 476 and n.5, 99 S.Ct. 1831, 1836 and n.5, 60 L.Ed.2d 404 (1979). I

---

**46.** *Cf. Touche Ross & Co. v. Redington,* 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979), comparing § 10(b) of the Securities Exchange Act of 1934 with § 17(a). As to the former, Justice Rehnquist noted that the Supreme Court had, in implying a private cause of action, "simply explicitly acquiesced in the 25–year old acceptance by the lower federal courts of an implied action under § 10(b)." In contrast, the Justice stated, "[t]here is no similar history of longstanding lower court interpretation in this case. Indeed, only one other court in the 45–year history of the 1934 Act has held that a private cause of action for damages is available under § 17(a)." *Id.* at 577–78 n.19, 99 S.Ct. at 2490 n.19. *Cf. New York Telephone Company v. New York State Department of Labor,* 566 F.2d 388, 395 (2d Cir. 1977), *aff'd,* 440 U.S. 519, 99 S.Ct. 1328, 59 L.Ed.2d 553 (1979) ("A longstanding practice 'is not something to be lightly cast aside,' " *quoting Walz v. Tax Commission,* 397 U.S. 664, 678, 90 S.Ct. 1409, 1416, 25 L.Ed.2d 697 (1970).).

express no view on this issue today as the appeal before us can be decided on a narrower and more certain ground. I would hold only that Congress did not intend to create a private right of action for compensatory relief under Title VI.

In contrast to the cases decided thereunder, Title VI itself is short and to the point. Only two of its provisions are relevant to this appeal: § 601 forbids discrimination by recipients of federal funds,[47] and § 602 requires federal agencies that disburse funds to issue regulations insuring nondiscrimination by recipients and authorizes the agencies to terminate funding if efforts to secure compliance by voluntary means are unsuccessful.[48] On its face then, Title VI provides for only one sanction against recipients of federal financial assistance who discriminate in the utilization of this mon-ey: termination of funding if and when efforts at voluntary compliance fail. Only the federal agencies providing the funds are expressly authorized to effect such a termination, and they may do so only after following the procedural steps spelled out in § 602.

In *Touche Ross & Co. v. Redington*, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979), and *Transamerica Mortgage Advisors, Inc. v. Lewis, supra*, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed. 146, the Supreme Court has reaffirmed that resort to the usual methods of statutory construction is appropriate in determining whether Congress intended to create a statutory cause of action. While the factors set forth in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), may be relevant to the required analysis,[49] they are useful primarily insofar as they give us

**47.** Section 601 reads:

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.
42 U.S.C. § 2000d.

**48.** Section 602 reads:

Each Federal department and agency which is empowered to extend Federal financial assistance to any program or activity, by way of grant, loan, or contract other than a contract of insurance or guaranty, is authorized and directed to effectuate the provisions of section 2000d of this title with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken. No such rule, regulation, or order shall become effective unless and until approved by the President. Compliance with any requirement adopted pursuant to this section may be effected (1) by the termination of or refusal to grant or to continue assistance under such program or activity to any recipient as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement, but such termination or refusal shall be limited to the particular political entity, or part thereof, or other recipient as to whom such a finding has been made and, shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found, or (2) by any other means authorized by law: *Provided, however, That*

no such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means. In the case of any action terminating, or refusing to grant or continue, assistance because of failure to comply with a requirement imposed pursuant to this section, the head of the Federal department or agency shall file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action. No such action shall become effective until thirty days have elapsed after the filing of such report.
42 U.S.C. § 2000d–1. Section 603 provides that agency action under § 602 is subject to judicial review, 42 U.S.C. § 2000d–2.

Section 604 limits agency action with respect to employment practices to situations where "a primary objective of the Federal financial assistance is to provide employment," 42 U.S.C. § 2000d–3. Defendants do not contest Judge Carter's finding that the federal financial assistance received by the NYPD fits this description.

**49.** In *CETA Workers' Organizing Committee v. City of New York*, 617 F.2d 926, 931 (2d Cir. 1980), we recently summarized the four factors outlined in *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975):

(1) whether the plaintiff was " 'one of the class for whose *especial* benefit the statute was enacted' "; (2) whether there was "any indication of legislative intent, explicit or im-

insight into the determinative question of congressional intent. *CETA Workers' Organizing Committee v. City of New York*, 617 F.2d 926, 931–32 (2d Cir. 1980). *But cf. Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979).

It is undisputed that the plain language of Title VI hints at no private cause of action for compensatory relief, and I have found nothing in the legislative history to suggest that Congress intended the statute to mean more than it says.[50] The debates make clear that the overarching purpose of Title VI was "to make sure that funds of the United States are not used to support racial discrimination." 110 Cong.Rec. 6544 (Remarks of Senator Humphrey, floor manager of the bill).

> plicit, either to create such a remedy or to deny one"; (3) whether implication of such a remedy was "consistent with the underlying purposes of the legislative scheme"; and (4) whether the cause of action was "one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law."
>
> In the instant case, even assuming in plaintiffs' favor that the answer to the first question is "yes" and the answer to the last is "no", my assessment of the second and third factors would preclude implication of a private cause of action for compensatory relief under Title VI.

**50.** There are indications, in fact, to the contrary. Some legislators explicitly rejected the idea of a private right of action. Representative Gill, for example, stated:

> Nowhere in this section do you find a comparable right of legal action for a person who feels he has been denied his rights to participate in the benefits of Federal funds. Nowhere. Only those who have been cut off can go to court and present their claim. 110 Cong.Rec. 2467 (1964).

Senator Kuchel remarked, *id.* at 6562: "[A] good case could be made that a remedy is provided for the State or local official who is practicing discrimination, but none is provided for the victim of the discrimination." Senator Keating agreed:

> Parenthetically, while we favored the inclusion of the right to sue on the part of the agency, the State, or the facility which was deprived of Federal funds, we also favored the inclusion of a provision granting the right to sue to the person suffering from discrimination. This was not included in the bill.

The history of Title VI—from President Kennedy's request that Congress grant executive departments and agencies authority to cut off federal funds to programs that discriminate against Negroes through final enactment of legislation incorporating his proposals—reveals one fixed purpose: to give the Executive Branch of Government clear authority to terminate federal funding of private programs that use race as a means of disadvantaging minorities . . . .

This purpose was first expressed in President Kennedy's June 19, 1963, message to Congress proposing the legislation that subsequently became the Civil Rights Act of 1964.[51] Representative Celler, the Chairman of the House Judici-

*Id.* at 7065. *But see Cannon v. University of Chicago*, 441 U.S. 677, 713–16, 99 S.Ct. 1946, 1965–67, 60 L.Ed.2d 560 (1979).

**51.** The President's message read in pertinent part:

> Simple justice requires that public funds, to which all taxpayers of all races contribute, not be spent in any fashion which encourages, entrenches, subsidizes or results in racial discrimination. Direct discrimination by Federal, State or local governments is prohibited by the Constitution. But indirect discrimination, through the use of Federal funds, is just as invidious; and it should not be necessary to resort to the courts to prevent each individual violation. Congress and the Executive have their responsibilities to uphold the Constitution also. . . .
>
> Many statutes providing Federal financial assistance, however, define with such precision both the Administrator's role and the conditions upon which specified amounts shall be given to designated recipients that the amount of administrative discretion remaining–which might be used to withhold funds if discrimination were not ended–is at best questionable. No administrator has the unlimited authority to invoke the Constitution in opposition to the mandate of the Congress. Nor would it always be helpful to require unconditionally–as is often proposed–the withdrawal of all Federal funds from programs urgently needed by Negroes as well as whites; for this may only penalize those who least deserve it without ending discrimination.
>
> Instead of permitting this issue to become a political device often exploited by those opposed to social or economic progress, it would be better at this time to pass a single

ary Committee, and the floor manager of the legislation in the House, introduced Title VI in words unequivocally expressing the intent to provide the Federal Government with the means of assuring that its funds were not used to subsidize racial discrimination . . . . [See 110 Cong.Rec. 1519 (1964).[52]]

*Bakke, supra*, 438 U.S. at 328–30, 98 S.Ct. at 2768 (Opinion of Brennan, White, Marshall and Blackmun, *JJ.*) (footnotes added).

Although many of the lawmakers believed that discrimination in federally funded programs was already unlawful, they apparently viewed the new legislation as necessary in order to "eliminate uncertainty concerning the power of federal agencies to terminate financial assistance to programs engaging in racial discrimination in the face of various federal statutes which appeared to authorize grants to racially segregated institutions." *Bakke, supra*, 438 U.S. at 333, 98 S.Ct. at 2770 (opinion of Brennan, White, Marshall and Blackmun, *JJ.*), *citing* 110 Cong.Rec. 6544 (Remarks of Senator Humphrey). Thus, by enacting Title VI Congress strove "to end the Government's complicity in constitutionally forbidden racial discrimination by providing the Executive Branch with the authority and the obligation to terminate its financial support of any activity which employed racial criteria in a manner condemned by the Constitu-

tion." *Bakke*, 438 U.S. at 336, 98 S.Ct. at 2772 (Opinion of Brennan, White, Marshall and Blackmun, *JJ.*) [53]

I can find nothing in the language or the legislative history of Title VI to support the view that the legislation was in addition intended to compensate individuals who have been improperly excluded from the benefits of a program receiving federal assistance. The language and the history of Title VII provide an instructive contrast. There the "make whole" purpose of the statute is evident from the legislators' remarks as well as the words of the statute itself. *Albemarle Paper Co. v. Moody, supra*, 422 U.S. at 419, 95 S.Ct. at 2372.

The next inquiry must be whether, despite the silence of both the statute and the legislative history, a private right of action for compensatory relief is so necessary to the fulfillment of the underlying purpose of Title VI that we must assume such a right to have been intended. As noted above the statute expressly sets forth in detail a mechanism for the enforcement of the proscription against discrimination in the use of federal money: administrative curtailment of funds. Section 602 provides, with great specificity, that termination may be effected only after attempts at voluntary compliance have failed, only after a hearing, and only after a report has been filed with the appropriate congressional commit-

---

comprehensive provision making it clear that the Federal Government is not required, under any statute, to furnish any kind of financial assistance–by way of grant, loan, contract, guaranty, insurance, or otherwise–to any program or activity in which racial discrimination occurs. This would not permit the Federal Government to cut off all Federal aid of all kinds as a means of punishing an area for the discrimination occurring therein–but it would clarify the authority of any administrator with respect to Federal funds or financial assistance and discriminatory practices.

109 Cong.Rec. 11161 (1963).

**52.** Representative Celler subsequently remarked:

In general, it seems rather anomalous that the Federal Government should aid and abet discrimination on the basis of race, color, or national origin by granting money and other

kinds of financial aid. It seems rather shocking, moreover, that while we have on the one hand the 14th amendment, which is supposed to do away with discrimination since it provides for equal protection of the laws, on the other hand, we have the Federal Government aiding and abetting those who persist in practicing racial discrimination.

It is for these reasons that we bring forth Title VI. The enactment of Title VI will serve to override specific provisions of law which contemplate Federal assistance to racially segregated institutions.

110 Cong.Rec. 2467 (1964).

**53.** I express no view on the substantive questions addressed in the various *Bakke* opinions, which I cite only for the light they shed on the availability of a private cause of action for compensatory relief under Title VI.

tees and 30 days have elapsed.[54] A private cause of action for compensatory relief does not fit comfortably into this scheme. "[W]here a statute expressly provides a·particular remedy or remedies, a court must be chary of reading others into it." *Transamerica, supra,* 444 U.S. at 19, 100 S.Ct. at 247. *See also CETA Workers', supra,* 617 F.2d at 933. Particularly is this so when the remedy implied may work at cross–purposes with the remedy expressed.

As § 602 makes evident, termination is the least–favored way to enforce the rule of non–discrimination–perhaps because it punishes innocent beneficiaries of federally funded programs as well as those who violate § 601. Of course, many of the programs made possible by federal money are created by Congress precisely to help minorities overcome the effects of past discrimination. Termination renders achievement of this goal impossible. Although terminat-

ed funds may be reallocated to another recipient, money may be wasted, time may be lost, and those in greatest need may be passed over. Therefore compliance is the preferred enforcement mechanism of Title VI. Compliance ensures both that the programs Congress has funded will not be disrupted *and* that they will be operated in a non–discriminatory fashion.[55]

One must consider the consequences, then, if private litigants seeking compensation are permitted to rush in where agencies fear to tread. One possible result would be a complete reassessment, by applicants for federal assistance, of the risks and benefits entailed in accepting federal funds. As things stand now, recipients face only two risks should they fail voluntarily to operate their programs in a discrimination–free manner–enforced compliance or termination of funding. There is no express provision in the statute for the recapture of

**54.** Should an agency fail to carry out its responsibilities under § 602, relief is available. Under § 603, any person aggrieved may, in appropriate circumstances, obtain judicial review of agency action under Title VI. . *See Board of Public Instruction of Taylor County v. Finch,* 414 F.2d 1068 (5th Cir. 1969); *Taylor v. Cohen,* 405 F.2d 277 (4th Cir. 1968) (timing of action); *Hardy v. Leonard,* 377 F.Supp. 831 (N.D.Cal.1974) (dismissed as moot); *see generally, Adams v. Richardson,* 480 F.2d 1159 (D.C. Cir.1973) (en banc).

**55.** *See Board of Public Instruction of Taylor County v. Finch, supra* note 54, citing remarks of Senator Pastore, 110 Cong.Rec. 7063 (1964):

[T]he purpose of Title VI is not to cut off funds, but to end racial discrimination ... As a general rule, cutoff of funds would not be consistent with the objective of the Federal assistance statutes if other effective means of ending discrimination are available.

Section 602, by authorizing the agency to achieve compliance "by other means authorized by law," encourages agencies to find ways to end discrimination without refusing or terminating assistance.

414 F.2d at 1075 n.11.

The Supreme Court discussed the drawbacks of termination in *Cannon v. University of Chicago, supra* (implication of private cause of action under Title IX of the Education Amendments of 1972; injunctive relief granted as in *Bakke*):

Title IX, like its model Title VI, sought to accomplish two related, but nevertheless somewhat different, objectives. First, Congress wanted to avoid the use of federal re-

sources to support discriminatory practices; second, it wanted to provide individual citizens effective protection against those practices. Both of these purposes were repeatedly identified in the debates on the two statutes.

The first purpose is generally served by the statutory procedure for the termination of federal financial support for institutions engaged in discriminatory practices. That remedy is, however, severe and often may not provide an appropriate means of accomplishing the second purpose if merely an isolated violation has occurred. In that situation, the violation might be remedied more efficiently by an order requiring an institution to accept an applicant who had been improperly excluded. Moreover, in that kind of situation it makes little sense to impose on an individual, whose only interest is in obtaining a benefit for herself, or on HEW, the burden of demonstrating that an institution's practices are so pervasively discriminatory that a complete cutoff of federal funding is appropriate.

441 U.S. at 704–705, 99 S.Ct. at 1961–62 (footnotes omitted).

As noted by Judge Coffrin, *infra,* the district court in *Cannon* held an action for money damages to be beyond the scope of Title IX. This determination was apparently not challenged on appeal, and therefore neither the Seventh Circuit nor the Supreme Court had occasion to address the issue of the availability of such a remedy under the statute. *Cannon v. University of Chicago,* 406 F.Supp. 1257 (N.D.Ill.1976).

funds that may have been spent in a non-complying manner and I know of no case in which an agency has attempted to force the return of funds given to a recipient during a period of non-compliance. *See Adams v. Richardson*, 356 F.Supp. 92, 100 (D.D.C.), *aff'd as modified*, 480 F.2d 1159, 1161 n.3 (D.C.Cir.1973) (en banc). If private actions for compensation are recognized, however, recipients would expose themselves to the additional risk of having to respond in damages, after the federal funds have been spent, even though they lacked any intention to discriminate, as in the instant case, and even though they have never received agency notice of non-compliance or been given a chance to achieve compliance with the help of the agency responsible. If potential recipients who, given the chance, might have operated discrimination-free programs are dissuaded from participation, federal agencies will be significantly hampered in their ability to carry out programs which Congress itself has chosen to authorize and fund. *Cf. Loughran v. Flanders*, 470 F.Supp. 110, 115 (D.Conn.1979) (no private cause of action for damages under Education for Handicapped Children Act of 1975; implication of such a remedy would thwart purpose of legislation by deterring participation by potential recipients because of potential liability).

It is not my purpose to express any view on the advantages or disadvantages of such an approach to Title VI. It is enough to say that I regard it as extremely unlikely that Congress intended to create, by its silence, a private remedy which works at cross purposes with the remedy explicitly provided for by the statute.[56] Although it is true that "courts may provide private litigants exercising implied rights of action *whatever relief is consistent with the congressional purpose,*" *Transamerica, supra,* 444 U.S. at 30, 100 S.Ct. at 252 (White, J., dissenting) (emphasis added), it is important

**56.** We agree with Judge Carter that the prospective declaratory and injunctive relief heretofore granted in private actions under Title VI may be less intrusive than the "draconian sanction of program termination," *Guardians III,* 466 F.2d at 1284. However, the present case illustrates that awards of *compensatory and retrospective relief* in such actions might have consequences far more crippling to the recipients of federal funds than termination. We regard it as highly improbable that Congress intended silently to arm private litigants with a weapon more devastating than that expressly created for the funding agencies themselves.

In light of my determination that Congress did not intend to create a private right of action for compensatory relief under Title VI, it is not necessary to consider the many troublesome questions that implication of such a remedy would pose. For example, it is not clear what causal relationship between the violation of § 601 and the alleged injury a plaintiff would be required to demonstrate. In the instant case we have been informed that the NYPD receives funds from the departments of Labor, Justice and Housing and Urban Development, but Judge Carter made no findings indicating what specific NYPD programs have been funded by these agencies. If no federal money goes for salaries or hiring, have plaintiffs made out a case? While plaintiffs have alleged that the NYPD discriminated against them in hiring, there is no allegation that any *federal program* was itself administered in a discriminatory fashion. Is such an allegation necessary? *See Coates v. Illinois State Board of Education,* 559 F.2d 445, 449 (7th Cir. 1977) (no private cause of action under Title VI where no allegation that specific actions under the federally funded program caused specific discriminatory effects); *McLeod v. College of Artesia,* 312 F.Supp. 498, 502 (D.N.M.1970) (no cause of action under Title VI; "no claim that the federal programs . . . have in any way been discriminatorily administered."). *See also Hupart v. Board of Higher Education,* 420 F.Supp. 1087, 1104 (S.D.N.Y.1976) (no cause of action under Title VI where program to which plaintiffs were denied admission "was not funded by federal monies until after the discrimination had occurred."). *But cf. Flanagan v. President & Directors of Georgetown College,* 417 F.Supp. 377, 382–84 (D.D.C.1976).

Another question not addressed by the court below is the proper relationship between the amount of federal money received and the liability of the defendants. In the instant case, Judge Carter made no finding as to how much federal money the NYPD had received during the years in question. It would be an extraordinary result, to say the least, if the department's liability exceeded the amount of the federal funds received, and yet no attempt was made below to limit the potential liability of defendants to the amount received by them, or more precisely, the amount spent by them in violation of § 601. *See generally Board of Public Instruction of Taylor County v. Finch, supra,* 414 F.2d 1068 (5th Cir. 1969) (limiting funding termination to particular program found to be in noncompliance).

that in our eagerness to carry out the will of Congress we do not engage in remedial overkill that will tend to frustrate rather than further the legislative intent. While it may be tempting to back up the enforcement mechanisms selected by Congress with others of our own devising, this is not our proper role.

The Supreme Court has cautioned that "the fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person." *Cannon v. University of Chicago, supra,* 441 U.S. 677, 99 S.Ct. at 1953, quoted in *Touche Ross, supra,* 442 U.S. at 568, 99 S.Ct. at 2485. "The dispositive question remains whether Congress intended to create any such remedy. Having answered that question in the negative, our inquiry is at an end." *Transamerica,* 444 U.S. at 24, 100 S.Ct. at 249. I would therefore consider Title VI no further.

## V.

### SECTION 1981

In issuing and subsequently reissuing the preliminary injunction now before us,

Judge Carter specifically rejected plaintiffs' § 1981 claim:[57] in *Guardians II* he relied exclusively on Title VII and in *Guardians III* he invoked only the combined authority of Title VII and Title VI. On appeal plaintiffs have urged, in the event we hold some portion of the relief granted to be unavailable under both Title VII and Title VI, that we consider § 1981 as an alternative basis for upholding the district court's order.[58] That eventuality has come to pass—our disposition of plaintiffs' Title VII and Title VI claims precludes the granting of relief for any period of time prior to March of 1972. We are therefore obliged to reach the as yet unsettled question of the applicability of § 1981 to cases where discriminatory impact, but not discriminatory intent, has been demonstrated.[59]

In describing this question as "unsettled," we are aware that it has been answered by this Court in the past. It is undisputed that before 1976, in employment discrimination cases brought under § 1981 *inter alia,* we did not require proof of purposeful discrimination.[60] *See, e. g., Kirkland v. New York State Department of Correctional Services,*

**57.** Judge Carter concluded, without discussion, that the same showing is required under § 1981 (and § 1983) as is required to make out a claim of discrimination under the Constitution. *Guardians II,* 431 F.Supp. at 534. Consequently, having found that plaintiffs had failed to demonstrate discriminatory intent, the district court held that *Washington v. Davis, supra,* precluded relief under the Constitution, and by extension, under §§ 1981 and 1983. When plaintiffs' § 1981 claim was revived on remand, Judge Carter, noting that the issue was sub judice before the Supreme Court, declined to reconsider his earlier ruling. *Guardians III,* 466 F.Supp. 1276 n.4, *citing Davis v. County of Los Angeles,* 566 F.2d 1334 (9th Cir. 1977), *cert. granted,* 437 U.S. 903, 98 S.Ct. 3087, 57 L.Ed.2d 1132 (1978), subsequently *vacated as moot,* 440 U.S. 625, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979). *See* note 54 *supra.*

**58.** The Equal Employment Opportunity Commission, as amicus curiae, has filed a brief addressed solely to the § 1981 issue. The Commission takes the position, as do plaintiffs, that § 1981 clearly prohibits both conduct having a discriminatory impact and intentionally discriminatory conduct. For purposes of discussion, all arguments advanced in support of this

interpretation of the statute will be considered as plaintiffs' arguments, whether raised in plaintiffs' own brief or in that submitted by the EEOC.

**59.** Plaintiffs do not challenge on appeal Judge Carter's determination that the evidence fell "far short" of establishing intentional discrimination on the part of defendants. This appraisal, which was based on Judge Carter's consideration of defendants' obligations under the New York State Constitution and the state's Civil Service Law and on an evaluation of evidence pertaining to minority recruitment efforts on the part of defendants, will therefore not be disturbed on appeal. *Guardians II,* 431 F.Supp. at 534–35.

**60.** Two of these cases centered on the pre–1972 conduct of municipal defendants and Title VII was therefore unavailable to the plaintiffs. *See Bridgeport Guardians, Inc. v. Members of Bridgeport Civil Service Commission,* 482 F.2d 1333, 1334 (2d Cir. 1973), *cert. denied,* 421 U.S. 991, 95 S.Ct. 1997, 44 L.Ed.2d 481 (1975); *Chance v. Board of Examiners,* 458 F.2d 1167 (2d Cir. 1972). In *Kirkland v. New York State Department of Correctional Services,* 520 F.2d 420, 423 n.1 (2d Cir. 1975), *cert. denied,* 429

520 F.2d 420 (2d Cir. 1975), *cert. denied,* 429 U.S. 823, 97 S.Ct. 73, 50 L.Ed.2d 84 (1976); *Bridgeport Guardians, Inc. v. Members of Bridgeport Civil Service Commission,* 482 F.2d 1333 (2d Cir. 1973), *cert. denied,* 421 U.S. 991, 95 S.Ct. 1997, 44 L.Ed.2d 481 (1975); *Chance v. Board of Examiners,* 458 F.2d 1167 (2d Cir. 1972). However, in *Washington v. Davis,* the Supreme Court subsequently pulled the legal rug out from under these decisions. Before *Washington v. Davis,* we had approached § 1981 with the belief that the Constitution itself prohibited conduct having a discriminatory impact as well as purposefully discriminatory conduct. Now that our constitutional premise has been declared erroneous, we must of course reconsider our statutory conclusion.

Section 1981 of Title 42 of the United States Code provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

Although the Supreme Court has not yet decided the "exact applicability" of § 1981, *New York City Transit Authority v. Beazer, supra,* 440 U.S. at 583–84 n.24, 99 S.Ct. at 1364 n.24, in the few years since *Washington v. Davis* was handed down a number of courts have addressed the issue.[61] Many, adopting the interpretation urged upon us today by defendants, have held that discriminatory purpose must be pleaded and proven in actions brought under § 1981. *See, e. g., Crawford v. Western Electric Company, Inc.,* 614 F.2d 1300, 1309 (5th Cir. 1980); *Mescall v. Burrus,* 603 F.2d 1266 (7th Cir. 1979); *Grigsby v. North Mississippi Medical Center, Inc.,* 586 F.2d 457, 460–61 (5th Cir. 1978); *Williams v. DeKalb County,* 582 F.2d 2 (5th Cir. 1978); *Chicano Police Officer's Association v. Stover,* 552 F.2d 918 (10th Cir. 1977); *Bronze Shields, Inc. v. New Jersey Department of Civil Service,* 488 F.Supp. 723 (D.N.J.1980); *Harris v. White,* 479 F.Supp. 996, 1002 (D.Mass.1979) (*citing Des Vergnes v. Seekonk Water District,* 601 F.2d 9, 15–16 (1st Cir. 1979)); *Ball v. Ridgeway Enterprises, Inc.,* 478 F.Supp. 456, 461 (S.D.Tex.1979); *Louisville Black Police Officers Organization, Inc. v. City of Louisville,* 21 EPD ¶ 30,330 (W.D.Ky. Sept. 18, 1979); *Arnold v. Ballard,* 448 F.Supp. 1025 (N.D.Ohio 1978); *Lewis v. Bethlehem Steel Corp.,* 440 F.Supp. 949 (D.Md.1977); *Johnson v. Hoffman,* 424 F.Supp. 490, 493–94 (E.D.Mo.1977), *aff'd,* 572 F.2d 1219 (8th Cir.), *cert. denied,* 439 U.S. 986, 99 S.Ct. 579, 58 L.Ed.2d 658 (1978); *Ortiz v. Bach,* 14 FEP Cas. 1019 (D.Colo.1977); *see also Detroit Police Officers' Association v. Young,* 608 F.2d 671, 692 (6th Cir. 1979), *pet. for cert. filed,* 48 U.S.L.W. 3466 (U.S.1980);

U.S. 823, 97 S.Ct. 73, 50 L.Ed.2d 84 (1976), Title VII was apparently available but was not pleaded.

**61.** Guidance from the Supreme Court regarding the correct interpretation of § 1981 has been eagerly awaited ever since *Washington v. Davis* took the lower courts by surprise in its definition of discrimination for *constitutional* purposes. Hopes for an early dispelling of the doubts engendered by *Washington v. Davis* were recently dashed when the high court vacated and remanded, on grounds of mootness, the case of *County of Los Angeles v. Davis,* 440 U.S. 625, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979). Certiorari had been granted to consider, *inter alia,* "whether the use of arbitrary employment criteria, racially exclusionary in operation, but not purposefully discriminatory, violates 42

U.S.C. § 1981 . . . ." 440 U.S. at 627, 99 S.Ct. at 1381; 437 U.S. 903, 98 S.Ct. 3087, 57 L.Ed.2d 1132 (1978). The determination of mootness, of course, precluded consideration of this issue.

The Supreme Court's comments in *Beazer* and in the grant of certiorari in *County of Los Angeles v. Davis* support the view that although § 1981 was pleaded in *Washington v. Davis* the Supreme Court did not address or settle the question of whether proof of discriminatory intent is necessary in § 1981 actions. *See Davis v. County of Los Angeles, supra,* 566 F.2d at 1339; *id.* at 1347 (Wallace, *J.,* dissenting); *Mescall v. Burrus,* 603 F.2d 1266, 1270 (7th Cir. 1979); *Williams v. DeKalb County,* 577 F.2d 248, 257 n.5 (5th Cir.), *modified on rehearing,* 582 F.2d 2 (5th Cir. 1978).

*Donnell v. General Motors Corp.*, 576 F.2d 1292, 1300 (8th Cir. 1978); *City of Milwaukee v. Saxbe*, 546 F.2d 693, 705 (7th Cir. 1976) (equating § 1981 with constitutional standard in suit alleging discriminatory selective law enforcement); *Walker v. Robbins Hose Co.*, 465 F.Supp. 1023, 1044 (D.Del.1979) (although unnecessary to decide issue because intentional discrimination found, view that § 1981 requires proof of racially discriminatory purpose "more persuasive."). *Accord, NAACP v. City of Corinth*, 83 F.R.D. 46, 62 (N.D.Miss.1979); *Harris v. Anaconda Aluminum Co.*, 479 F.Supp. 11, 21 (N.D.Ga.1979). *Also compare Dickerson v. United States Steel Corp.*, 472 F.Supp. 1304, 1316 (E.D.Pa.1978), *and Croker v. Boeing Co. (Vertol Div.)*, 437 F.Supp. 1138, 1181 (E.D.Pa.1977) (intent standard) *with Pennsylvania v. Local 542*, 469 F.Supp. 329 (E.D.Pa.1978) (impact standard).

To date only a few courts have adopted the contrary view espoused by plaintiffs. *See, e. g., Davis v. County of Los Angeles*, 566 F.2d 1334 (9th Cir. 1977), *vacated as moot*, 440 U.S. 625, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979); *Kinsey v. First Regional Securities, Inc.*, 557 F.2d 830 (D.C.Cir. 1977) (dictum); [62] *Dawson v. Pastrick*, 441 F.Supp. 133 (N.D.Ind.1977), *rev'd, in part, on other grounds*, 600 F.2d 70 (7th Cir. 1979) (no discussion of impact of *Washington v. Davis* on § 1981 analysis). *Cf. Brown v. New Haven Civil Service Board*, 474 F.Supp. 1256, 1264 (D.Conn.1979) (Newman,

J. ) (relief denied under § 1981 where plaintiffs failed to make out prima facie case of discriminatory impact under Title VII). Although *Davis v. County of Los Angeles* is the case most frequently cited for the proposition that discriminatory impact is sufficient, in our view *Davis* sheds very little light on the intended scope of § 1981. Without discussing the language or history of the statute the *Davis* majority simply announced that since § 1981 and Title VII both prohibit discrimination in employment and since similar remedies are available under the two statutes, the court would continue to interpret them to prohibit the same types of conduct until the Supreme Court explicitly directs otherwise.

During recent history, every court which has considered the question has construed § 1981 to bar discrimination in employment. The courts consistently have employed Title VII principles as a benchmark not only in cases involving alleged discriminatory impact, but in other contexts as well. Indeed, the Supreme Court has recognized that Title VII and § 1981 embrace "parallel or overlapping remedies against discrimination." In the absence of any express pronouncement from the Supreme Court—a pronouncement not delivered in *Washington*—we are unwilling to deviate from this established practice.

566 F.2d at 1340 (citations omitted).

Judge Wallace, writing in dissent, rejected the majority's analysis as inadequate.[63]

---

**62.** In *Kinsey v. First Regional Securities, Inc.*, 557 F.2d 830, 838 n.22 (D.C.Cir.1977), a two-judge panel rejected, without discussion, the requirement of discriminatory purpose in § 1981 actions. It appears that full relief was available under Title VII.

**63.** Judge Wallace emphasized that he was addressing the § 1981 issue only to express his disagreement with the majority. Taking the position that the case could have and should have been decided solely under Title VII, the dissent characterized the majority's discussion of § 1981 as "wholly unnecessary" as well as "incorrect." 566 F.2d at 1347 (Wallace, J., dissenting) (alluding to majority opinion, 566 F.2d at 1341 n.14.) Dissenting from the Supreme Court's subsequent vacatur of *Davis* on mootness grounds, Justice Stewart agreed,

terming decision of the § 1981 issue "completely unnecessary." 440 U.S. at 635, 99 S.Ct. 1385 (Stewart, J., dissenting). Justice Powell, although viewing the matter as "not free from doubt" and conceding that the basis of the Ninth Circuit's decision "is not clear," thought otherwise, concluding that "the decision of the Court of Appeals *seems* to have been based on a conclusion that independent violations of § 1981 had occurred." 440 U.S. at 640 n.5, 99 S.Ct. at 1388 n.5 (Powell, J., dissenting) (emphasis added).

In discussing the frequently cited court of appeals opinion in *Davis* we express no view concerning its precedential weight, if any, within the Ninth Circuit, in view of the Supreme Court's subsequent vacatur of that decision on grounds of mootness, nor do we hazard a prediction as to that court's future stance on the

That both statutes [Title VII and § 1981] can apply to the same facts and that both may afford similar remedies is beside the point. The same can be said of Title VII and the Fourteenth Amendment, yet, after *Washington v. Davis,* there remains an essential "operational distinction" between them. The proper inquiry is whether the legislative history of section 1981 indicates that it *should* track the Fourteenth Amendment's standards of proof rather than those of Title VII. I believe that the history of section 1981 strongly suggests precisely that.

*Id.* at 1348. We agree that the proper inquiry must focus on the intent of Congress in passing § 1981. Furthermore, we do not believe that we may properly delay making this determination until such time as the Supreme Court speaks on this question.

■ Certainly nothing in the language of § 1981 supports the thesis that the statute was intended to prohibit facially neutral practices that can be shown to have a disproportionate racial impact despite the absence of any purpose to discriminate. In the instant case, for example, as long as the challenged lists were in use, no applicant, regardless of race, could enter into an employment contract with defendants without achieving a grade of 75 or more on an entry–level examination, and for applicants of all races the order of hiring was determined by performance on these tests. Since the examinations were equally arbitrary and non–job–related as to applicants of all races, it would seem to be a distortion of the plain meaning of the statute to conclude that plaintiffs were denied the "same right to make contracts . . . as is enjoyed by white citizens." All applicants were in fact permitted to compete for employment on precisely the same terms.[64]

The structure of the statute supports this reading of its language. The "contracts" provision of § 1981 must, of course, be interpreted in the context of the statute as a whole. We see three possible ways to approach § 1981: either (1) Congress understood the phrase "the same right . . . as is enjoyed by white citizens" to confer the right to challenge, on the ground of disproportionate impact, facially neutral practices bearing on any of the rights enumerated in § 1981, or (2) Congress intended equality to be understood in terms of purposeful discrimination as to some enumerated rights and in terms of disproportionate impact as to other rights specified in the same sentence, or (3) Congress understood "the same right . . . as is enjoyed by white citizens" to guarantee that as to each specified right, only conduct intended to discriminate on the basis of race would henceforth be unlawful. We regard the third choice as the least improbable construction. Nothing in the language or structure of § 1981 would justify singling out the right to contract for special treatment. On the other hand, plaintiffs have not suggested to us, nor is it immediately apparent, how the concept of disproportionate impact would give dimension to the notion of equality in regard to such rights as the right to sue, the right to be a party to a legal proceeding, or the right to give evidence.

The breadth of the term "contracts," even if we were to view it in isolation from the other rights specified, also militates against reading into this century–old statute modern concepts developed primarily in the specialized area of employment discrimination. While purposeful racial discrimi-

§ 1981 issue. *Compare County of Los Angeles v. Davis,* 440 U.S. at 634 n.6, 99 S.Ct. at 1384 n.6 *with id.* at 646 n.10, 99 S.Ct. at 1391 n.10 (Powell, *J.,* dissenting). *See Williams v. City and County of San Francisco,* 483 F.Supp. 335, 344 (N.D.Cal.1979).

**64.** Compare the Supreme Court's treatment of the phrase "equal protection":

[W]e have difficulty understanding how a law establishing a racially neutral qualification for employment is nevertheless racially discriminatory and denies "any person . . . equal protection of the laws" simply because a greater proportion of Negroes fail to qualify than members of other racial or ethnic groups.

*Washington v. Davis, supra,* 426 U.S. at 245, 96 S.Ct. at 2050.

nation is something that can be understood and recognized in a variety of factual settings, the measurement of disproportionate racial impact and the definition of circumstances justifying a practice having such an impact are tasks that may vary greatly according to the type of contract under scrutiny. We consider it almost inconceivable that § 1981 was intended to outlaw in one stroke, facially neutral practices bearing on the ability of persons to make contracts concerning sales, rentals, banking, public accommodations, private schooling, insurance, personal services, or anything else, where such practices have a disproportionate racial impact unjustified by some type of necessity.

The legislative history of § 1981 fails to convince us that the intent of the statute is more subtle than its language and structure would indicate. Section 1981 traces its origins back to the Civil Rights Act of 1866 and has ties with both the Thirteenth and Fourteenth Amendments to the Constitution. Its evolution has been traced and the significance of its history has been debated elsewhere and we will not burden this already lengthy opinion by repeating what we cannot improve upon. *See, e. g., McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976); *Runyon v. McCrary*, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976); *id.* at 192, 96 S.Ct. at 2605 (White, *J.*, dissenting); *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968) (§ 1982 case shedding light on background of 1866 Act). It is sufficient to say that plaintiffs have been unable to cite and we have been unable to find *anything* in the legislative history to indicate that either the

Thirty–Ninth Congress, which enacted the 1866 Act over a presidential veto, or the later congresses that subsequently re–enacted the provision understood the law to prohibit anything other than the racially motivated refusal to treat whites and non–whites in the same, neutral manner.[65]

Objectively viewed, the language, structure and history of § 1981 all point to the conclusion that the statute was simply intended to prohibit purposeful racial discrimination in a wide variety of circumstances, including but not limited to employment discrimination. Nevertheless, plaintiffs argue that § 1981 should be interpreted to prohibit, in addition, facially neutral conduct with a discriminatory impact because to do so would render § 1981 "consistent with" Title VII. The two statutes differ in many ways. Title VII is concerned exclusively with employment discrimination; § 1981 is concerned with a wide variety of rights. Title VII is lengthy, detailed and sophisticated, reflecting a sensitivity to such modern realities and concepts as labor unions, professional employment testing and bona fide occupational qualifications; § 1981 is a short stroke painted with a broad brush. Title VII establishes an elaborate administrative enforcement mechanism and conditions the right to judicial relief on exhaustion thereof; § 1981 lacks even its own limitation period.

While § 1981 and Title VII certainly overlap to some degree and may complement one another in the area of employment discrimination, every indication suggests that they were not intended to reach precisely the same conduct. We lack the power to reshape § 1981 in the mold of Title VII; only Congress can redraft an act of Con-

---

**65.** Similarly we can find no language in the Supreme Court's recent analyses of § 1981 and its companion provision § 1982, which also traces its history back to § 1 of the Civil Rights Act of 1866, to support plaintiffs' interpretation. *See Runyon v. McCrary*, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976) (§ 1981), *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968) (§ 1982). While the Court was of course addressing in these cases the very different question of whether the statutes were intended to reach private conduct, nothing in any of the several

opinions written in these two cases even hints at the notion that the statutes were intended to reach other than intentional discrimination, whether by the state or by private parties. In fact, in *Jones v. Mayer Co.*, the Supreme Court concluded:

> Hence the structure of the 1866 Act, as well as its language, points to the conclusion . . . that § 1 was meant to prohibit *all* racially *motivated* deprivations of the rights enumerated in the statute . . . . .

*Id.* at 426, 88 S.Ct. at 2196 (second emphasis added).

gress. *See Davis v. County of Los Angeles, supra,* 566 F.2d at 1350 (Wallace, J., dissenting); *Arnold v. Ballard, supra,* 448 F.Supp. at 1028; *Lewis v. Bethlehem Steel Corp., supra,* 440 F.Supp. at 965.

Our determination as to the intended scope of § 1981, as expressed in its language, structure and history, is dispositive. We merely note, and need not rely on, the fact that acceptance of plaintiffs' interpretation of § 1981 would lead to a troublesome anomoly: as one court has put it, if we accepted plaintiffs' view of § 1981, the Supreme Court's decision in *Washington v. Davis* would be rendered "meaningless," *Croker v. Boeing Co. (Vertol Div.), supra,* 437 F.Supp. at 1181.

> [B]ecause section 1981 can probably be invoked in a great many cases brought directly under the Fourteenth Amendment, the consequence of judicially creating a less demanding standard for section 1981 than for the Fourteenth Amendment might often be to circumvent the holding in *Washington v. Davis* altogether. In the vast array of cases such as the one before us now and *Washington v. Davis* itself, where Title VII does not apply but Section 1981 and the Fourteenth Amendment do, one could easily avoid the intent requirement of the Amendment by simply pleading section 1981.

*Davis v. County of Los Angeles, supra,* 566 F.2d at 1350 (Wallace, J., dissenting) (footnote omitted). Furthermore, if proof of discriminatory intent is not required under § 1981, serious questions might be raised,

under § 1981, about " 'a whole range of tax, welfare, public service, regulatory, and licensing statutes' " that pass muster under the Fourteenth Amendment.[66] *Id.* at 1350–51, *quoting Washington v. Davis,* 426 U.S. at 248, 96 S.Ct. at 2051.

For the reasons discussed we affirm Judge Carter's rejection of plaintiffs' claim under § 1981.[67]

## VI.

## THE REMAND

For the foregoing reasons we vacate the order of the district court and remand the case for further proceedings in conformity with this opinion.

■ Specifically, today's decision requires that the district court award only such relief as is available to plaintiffs under Title VII. While the seniority, back pay and back benefit relief granted may therefore not take into account any period of time preceding the date Title VII became applicable to municipalities,[68] within that framework the district judge may exercise broad discretion in fashioning a remedy. We therefore reject defendants' suggestion that it was an abuse of discretion for the district court to order defendants to consult with plaintiffs' counsel and plaintiffs' experts in drawing up new examinations for the immediate future. Indeed in *Guardians I* we encouraged precisely this type of cooperation:

> [W]e think the district court would have done well to direct that the municipal defendants should disclose the proposed

**66.** As we recently remarked in another context, it is our duty as an inferior court not to "outflank the careful doctrinal barriers that the Supreme Court has constructed" by resort to "hairline distinctions." *Parent Association of Andrew Jackson High School v. Ambach,* 598 F.2d 705, 715 n.7 (2d Cir. 1979) (declining to reach under Thirteenth Amendment de facto school segregation not reachable under the Fourteenth).

**67.** Our disposition of the intent vs. impact issue renders unnecessary any discussion of the timeliness of plaintiffs' § 1981 claim. We also need not address, and we therefore express no opinion on, the question of the applicability of § 1981 to charges of discrimination against Hispanics. *See McDonald v. Santa Fe Trail*

*Transportation Co.,* 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976); *Jones v. Alfred H. Mayer Co., supra,* 392 U.S. at 413, 88 S.Ct. at 2189; *Manzanares v. Safeway Stores, Inc.,* 593 F.2d 968 (10th Cir. 1979); *Ridgeway v. International Brotherhood of Electrical Workers,* 466 F.Supp. 595, 597 (N.D.Ill.1979).

**68.** We need not and do not address the issue of the propriety of considering prior employment practices in fashioning prospective affirmative relief, as opposed to retrospective seniority adjustments or awards of back pay and back benefits. *Cf. Guardians Association v. Civil Service Commission, supra,* 630 F.2d 79 (2d Cir. 1980).

examination to plaintiffs' counsel and expert, under an appropriate protective order, and afford them an opportunity to advance constructive criticisms, which the defendants should have carefully considered, without obligation to accept. 490 F.2d at 404. *See also Teamsters, supra,* 431 U.S. at 364, 97 S.Ct. at 1869. Further, we do not view it as an abuse of discretion under Title VII for the district court to order that a sergeants examination be given, within a reasonable period of time. Those who have been unable to take previous promotional examinations because of failure to meet the length of service requirement cannot be made whole unless they are given a chance to compete for advancement on the basis of their adjusted seniority dates. Defendants have not been ordered to grant more promotions than are called for by their staffing needs; they have in effect been ordered only to ensure that those promotions that are granted are granted on a non-discriminatory basis.

On remand the district court is directed to clarify its intentions regarding the award of back pay, if any; to clarify its rationale for taking the department's now defunct height requirement into account in determining the constructive seniority dates to be assigned to plaintiffs, *see* note 2, *supra*; and to clarify the plaintiff class to which its order applies, specifically, whether that class has been expanded beyond the revised limits announced by the court in *Guardians III*, 466 F.Supp. at 1278.

Finally, with a humility and an admiration born of our own lengthy struggle with this complex and difficult case, we request the district court to act as expeditiously as possible in reframing its remedial order so that both plaintiffs and defendants may finally turn their attention to their respective duties.

## APPENDIX

### CIVIC AWARENESS QUESTIONS

(from examination #0013, administered in 1970)

32. The New York Knickerbockers play their home basketball games at

(A) the Coliseum

(B) Lincoln Center

(C) Madison Square Garden

(D) Rockefeller Center.

33. When the 1970 Census is completed, the nation's largest cities are expected to show a decrease in population since 1960. The main reason for this is that

(A) crowded conditions in cities have caused lower birth rates

(B) many middle-income families have moved from the cities to the suburbs

(C) fewer jobs have been available in the cities

(D) stricter welfare laws have driven the poor out of the cities.

36. Last summer, President Nixon announced some changes in the Office of Economic Opportunity. He did this in order to try to

(A) give every American a chance to participate as much as he can in American economic life

(B) reduce American buying of foreign products

(C) make more Americans eligible for home relief

(D) increase the power of all labor unions.

39. Of the following, the group that has *not* been on strike during the past 12 months is the

(A) Jersey City teachers

(B) N. Y. C. transit workers

(C) New York area letter carriers

(D) N. Y. C. gravediggers.

40. People have become concerned with man's future on earth because of the increasing amount of

(A) high rise apartment houses

(B) air and water pollution

(C) family planning

(D) wasteful farming.

**270**

## CODING

(from examination #9080, administered in 1969)

| Code Letter | M | W | N | P | R | S | Z | E | F | K |
|---|---|---|---|---|---|---|---|---|---|---|
| Matching Number | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 0 |

In each question numbered 95 to 100, there are three pairs of code letters and numbers. In each pair, each code letter should have the same matching number it has in the Code Table.

In some of the pairs, one of the code letters may have a wrong matching number. Look at the 3 pairs of letters and numbers in each question carefully. If there is a wrong matching number in

only *one* of the pairs in the question, mark your answer A

just *two* of the pairs in the question, mark your answer B

all *three* of the pairs in the question, mark your answer C

*none* of the pairs in the question, mark your answer D.

| Sample: | SMFKZ | 61907 |
|---|---|---|
| | ERPWM | 88421 |
| | NMKZW | 31073 |

In the above sample, the first pair is right because each code letter has the same matching number it has in the Code Table. In the second pair, the matching number for the code letter R is wrong because it should be 5 instead of 8. In the third pair, the matching number for the last code letter W is wrong because it should be 2 instead of 3. Since there is a wrong matching number in just two of the pairs, the answer to the sample is (B).

95. MNRZKERRP–135708554

WNPSREFNM–234658931

PENZMENRW–483718352

96. KFEZSPRNW–099764532

WPSMFKNNM–246190333

PSRRPSRPN–465556543

\* \* \* \* \* \*

## SPACE RELATIONS

(from examination #9080, administered in 1969)

Each question from 89 to 94 consists of three figures of different sizes and shapes. Pick as your answer that lettered choice which can be obtained by placing all three figures on top of, or next to, one another.

SAMPLE:

In the example above, the only lettered choice that can be obtained by placing the three figures on top of, or next to, each other is choice (B) because the triangle, square, and circle, although in different positions, are the same size as they were before.

89.

90.

KELLEHER, District Judge, concurring:

 I concur in the results set forth in Judge Meskill's opinion and in the reasons therein set forth, except that I join Judge Coffrin insofar as he finds the absence of discriminatory intent as the proper basis on which to reverse as to the relief granted under Title VI.

In regard to the relief ultimately to be awarded, the district court is presented

with the requirement under the law that a delicate balance be struck of a sort not common to the majority of employment discrimination claims awarded under Title VII. It would appear inappropriate for this court to direct the district court, as a matter of law, to require wholesale reshuffling of the seniority lists from which future appointments must be made. As an equitable remedy, any such reshuffling must take into account the duly–acquired seniority status of those presently situated thereon. I concur in the remedy which will require new examinations for promotion to be held and that the length–of–service requirement for eligibility to take such examination may properly be modified to compensate for past discrimination. It may be that the remedy of damages and the propriety thereof is to be placed on the equitable scale in measuring the kind and character of compensation for past discrimination.

In this connection, the Court below should consider *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976), which discusses in detail the issues which surround the award of retroactive seniority to plaintiffs asserting a claim under Title VII. In *Franks*, the Court–in ruling that an award of retroactive seniority was appropriate under the circumstances of the case at hand–observed that:

"... [T]he burden of the past discrimination in hiring is with respect to competitive status benefits divided among the discriminatee and nondiscriminatee employees under the form of relief sought. The dissent criticizes the Court's result as not sufficiently cognizant that it will 'directly implicate the rights and expectations of perfectly innocent employees.' [citation omitted] We are of the view, however, that the result which we reach today [in awarding retroactive seniority to discriminatee employees]–which, standing alone, establishes that a sharing of the burden of the past discrimination is presumptively necessary–is entirely consistent with any fair characterization of equity jurisdiction, particularly when considered in light of our traditional view that '[a]ttainment of a great national policy . . . must not be confined within narrow canons for equitable relief deemed suitable by chancellors in ordinary private controversies.' [citation and footnotes omitted]"

424 U.S. at 777–778, 96 S.Ct. at 1270–1271.

However, the *Franks* court thereafter qualified its position by noting that the tool of retroactive seniority could be inappropriate in certain circumstances:

"In holding that class–based seniority relief for identifiable victims of illegal hiring discrimination is a form of relief generally appropriate under § 706(g), we do not in any way modify our previously expressed view that the *statutory scheme of Title VII 'implicitly recognizes that there may be cases calling for one remedy but not another*, and–owing to the structure of the federal judiciary–these choices are, of course, left in the first instance to the district courts.' [citation omitted] *Circumstances peculiar to the individual case may, of course, justify the modification or withholding of seniority relief for reasons that would not if applied generally undermine the purposes of Title VII.*[41]

[footnote 41: "Accordingly, to no 'significant extent' do we '[strip] the district courts of [their] equity powers.' *Post*, at 1274. Rather our holding is that in exercising their equitable powers, district courts should take as their starting point the presumption in favor of rightful–place seniority relief, and proceed with further legal analysis from that point; and that such relief may not be denied on the abstract basis of adverse impact upon interests of other employees but rather only on the *basis of unusual adverse impact arising from facts and circumstances that would not be generally found in Title VII cases*." * * *]

424 U.S. at 779, 96 S.Ct. at 1271 [emphasis added].

The Court below on remand may properly find that just such an exceptional circum-

stance exists here. Although, as the *Franks* Court noted, claims brought pursuant to Title VII regarding employment in private enterprise serve to vindicate a national policy against racial discrimination in employment, the case at hand differs from the typical private sector employment discrimination action in that another facet of the public interest is involved—one which must be given substantial weight. Vindication of the public's paramount interest in the protection of its security demands that the police department be an effective, experienced, efficient, functional instrumentality, the high morale of which must be regarded as a correspondingly paramount interest. To displace officers from a seniority status duly acquired after years of arduous work and physical risk would inevitably undermine the morale of the police department to a very substantial degree. As a result, the department could be deprived of the wisdom born of the experience of those in its leadership positions.

The law is not *required* to disregard the effects of a retroactive award of competitive status seniority; indeed, in an employment activity such as this, where the public safety and welfare are so closely intertwined with the private rights of plaintiffs which are at stake, the equitable conscience of the district court must be greatly concerned with the broader impact of its chosen remedy upon all of the citizens of New York City—not just upon plaintiff class members. In the private enterprise context, any harm to an employer which may arise from a judicially—imposed remedy for past discrimination is limited to impairment of that employer's profit—making capacity. Here, any impairment in the smooth operation of the police department would result in harm enveloping an infinitely broader group than merely the employer: such impairment diminishes the protections afforded by the police to the public at large. Therefore, it is inconceivable that, in adopting Section § 706(g) of Title VII, Congress was not necessarily cognizant of instances such as this where the interests at stake transcend the immediate rights of the employer and employees involved.

Accordingly, it would seem that the following approach should be taken upon remand. The issue of liability has been determined in favor of plaintiffs, giving rise to an entitlement on their behalf to relief. In addition to the remedy of money damages as recompense for past deprivations, with regard to the future the relief to be granted shall be that which emerges from the sound discretion of the district court in the exercise of its equitable powers. In exercising such powers, the district court should take into account all the circumstances of this case—taking new evidence, if necessary—to determine the extent to which the balance of equities requires the non—destruction of the present seniority system, as such system affects the morale and functional competence of the police department in vindicating the public's interest in security.

COFFRIN, District Judge (concurring):

1 join Judge Meskill's opinion in all respects except that I would reverse on the Title VI issue for different reasons. I disagree with his conclusions that Title VI does not permit a private action for compensatory relief and that the issue may be resolved on that ground alone. I would reverse as to the relief ordered below pursuant to Title VI because, as the district court found, there is no evidence of discriminatory intent in this case.

In reaching his conclusion concerning the availability of private actions under Title VI Judge Meskill relies upon *Transamerica Mortgage Advisors, Inc. (TAMA) v. Lewis,* 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979). That decision holds that the necessarily implicit private right to an equitable remedy of rescission under section 215 of the Investment Advisors Act of 1940, 15 U.S.C. §§ 80b–1 to 80b–21, is exclusive and no private right to a legal remedy for damages exists under section 206 of that Act. The Supreme Court reached this conclusion

by a careful analysis of the statutory scheme and its language and found in section 215 an express intent that certain contracts be void. They reasoned therefrom that the customary legal remedies for voidness, including rescission, must be available to the contracting parties. By contrast section 206 merely declares certain conduct to be unlawful without thereby necessarily creating a private cause of action for damages.

*Transamerica* does provide ample authority for the proposition that a statutory scheme may distinguish and limit the remedies available in an implied private right of action. In the instant case, however, a true distinction between types of relief is not drawn by Judge Meskill. Rather, without finding that noncompensatory relief is available privately under Title VI, he simply would hold that compensatory relief is not. To the extent that a distinction may be inferred from this approach Judge Meskill does not find it in the language of Title VI but rather in the treatment of that Title by the federal judiciary, despite his stated purpose of discerning the intent of Congress as the Supreme Court did in *Transamerica*. Regardless of the approach I do not believe this case demands an attempt to distinguish between the remedies available under Title VI as the language of the Investment Advisors Act demanded the Supreme Court's distinction in *Transamerica*.

Section 601 of the Civil Rights Act, unlike section 206 of the Investment Advisors Act and contrary to Judge Meskill's characterization, is not cast in the prohibitory language of a penal statute. It does not forbid discrimination by recipients of federal funds, it provides simply that persons shall not be excluded from the benefit of those funds because of race, color or national origin. Its language is not directed to a violator's conduct, it is directed to the victims' rights. Section 602, moreover, does not provide such victims a remedy of any sort, even indirectly.[1] It provides the executive branch with an enforcement mechanism and sanction power the existence of which would be questionable in the absence of express language. *NAACP v. Medical Center, Inc.*, 599 F.2d 1247, 1255 (3d Cir. 1979). The Title VI language does not compel Judge Meskill's distinction between kinds of remedies. If section 601 does not imply a private right to compensatory relief it would be because it implies no private right to any type of remedy rather than because it requires distinct treatment of compensatory relief.

In contrast to its treatment of the Mortgage Advisors Act in *Transamerica*, the Supreme Court has examined Title VI without even hinting that private rights of action thereunder would depend for their existence on distinctions among the remedies sought. In *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), the Court analyzed Title IX of the Education Amendments of 1972 by comparing it with the virtually identical language of Title VI of the Civil Rights Act. The unmistakable import of the finding of a private right of action unlimited as to remedy under Title IX is that the same conclusion would be reached if the issue of the existence of a private right under Title VI were presented. Significantly the Court did not distinguish among the kinds of remedies sought or available under Title IX, saying simply that "petitioner may maintain her lawsuit." *Id.* at 717, 99 S.Ct. at 1968. The petitioner's action sought declaratory, injunctive and monetary relief in the district court; that court indicated in its Opinion that monetary relief would be inappropriate. *Cannon v. University of Chicago*, 406 F.Supp. 1257, 1259 (N.D.Ill.1976). The Seventh Circuit affirmed without com-

---

1. It would seem to go without saying that one does not remedy a deprivation by terminating entirely the source of the benefit deprived. This is the only "remedy" Judge Meskill identifies.

ment on the district court's distinction among the remedies sought. *Cannon v. University of Chicago,* 559 F.2d 1063 (7th Cir. 1976).

■ I am persuaded by *Cannon* and *Regents of the University of California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), that a private right of action exists under Title VI irrespective of the compensatory effect of the relief sought or granted. *Transamerica* concerns a statute wholly different from Title VI in content and philosophical purpose, and the distinction it draws among privately available remedies along legal and equitable lines simply does not support Judge Meskill's distinction in the present case along compensatory and noncompensatory lines; *Transamerica* fails to persuade me as it does him.

The foregoing leads me to disagree with Judge Meskill's legal conclusion about the privately available remedies under Title VI. In addition I am unconvinced that that conclusion, if correct as a matter of law, disposes entirely of the Title VI issues this case presents. Judge Meskill would hold that compensatory relief is not privately available under Title VI, but he does not specify the details of Judge Carter's ten page Order that this holding would affect. He concedes in footnote 43 that the Order includes noncompensatory elements and observes that two of these elements are incidentally available to the entire class under Title VII, making the issue of their availability under Title VI unnecessary to decide. His analysis, however, fails to consider the noncompensatory relief in Judge Carter's Order that may not incidentally benefit the entire class under Title VII. Judge Meskill apparently would leave to the district court

on remand the task of sorting through the Order and determining the disposition of its elements according to their compensatory character. Because reasonable minds might disagree on the characterization of given elements of the Order,[2] it is conceivable if not inevitable that the district court on remand will identify elements as to the disposition of which the court would have been given no guidance. Moreover, Judge Meskill's approach apparently would open the door to needless litigation and appeal in this case and others of questions about the compensatory character of particular remedies.[3]

■ Notwithstanding my difficulties with Judge Meskill's approach, I concur in his reversal of the Title VI component of Judge Carter's Order because, as stated earlier, I believe Title VI requires proof of discriminatory intent. Inasmuch as the evidence in this case supports only a finding of discriminatory impact I too would reverse.

Judge Carter's holding that the substantive standard for illegal employment discrimination under Title VI is the "impact" standard of Title VII rather than the "intent" standard of the Constitution, *Guardians Association v. Civil Service Commission,* 466 F.Supp. 1273, 1287 (S.D.N.Y.1979), appears to be contradicted by *Bakke.* Justice Powell concluded that "Title VI must be held to proscribe only those racial classifications that would violate the Equal Protection Clause or the Fifth Amendment." *Bakke,* 438 U.S. at 287, 98 S.Ct. at 2747. Justices Brennan, White, Marshall and Blackmun agreed with that assessment in unequivocal language. *Id.* at 325, 328, 98 S.Ct. at 2768. Justice Brennan, speaking for himself and the other three Justices stated: "In our view, Title VI prohibits

**2.** Although Judge Meskill apparently would characterize constructive seniority as compensatory relief, text accompanying notes 43 & 44 *supra,* this remedy seems to meet Judge Meskill's definition of noncompensatory relief, note 43 *supra,* because it corrects a present wrong. This court should not view such a remedy as retrospective compensation for past harm simply because the judicial process takes time.

**3.** It seems almost inevitable that whatever the district court would do on remand would return to this court on appeal–the issue being whether the district court correctly identified the compensatory and therefore unavailable remedies granted under Title VI.

only those uses of racial criteria that would violate the Fourteenth Amendment if employed by a State or its agencies." *Id.* at 328, 98 S.Ct. at 2768. A majority of the Court thus seems to take the position that conduct is not actionable under Title VI unless it is actionable under the Constitution, which under its current construction imposes an "intent" standard. *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).

Although *Lau v. Nichols*, 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974), may be read for the contrary proposition, as indeed Judge Carter read it, *Guardians*, 466 F.Supp. at 1285, *Bakke* appears to undercut *Lau's* currency.

> We recognize that *Lau* . . . may be read as being predicated upon the view that, at least under some circumstances, Title VI proscribes conduct which might not be prohibited by the Constitution. Since we are now of the opinion . . . that Title VI's standard . . is no broader than the Constitution's, we have serious doubts concerning the correctness of what appears to be the premise of that decision.

*Bakke*, 438 U.S. at 352, 98 S.Ct. at 2780 (Brennan, J., White, Marshall and Blackmun, JJ., concurring).

Such a construction of Title VI leads to the unhappy anomaly that there would be a more stringent standard for proving illegal discrimination by employers utilizing federal funds than there would be for nonfederally–funded employers under Title VII. Nevertheless the language of *Bakke* seems to compel this result.[4]

Judge Carter found that there was no intentional discrimination in this case, *Guardians*, 466 F.Supp. at 1275, which leads to the conclusion that, under the analysis outlined above, appellants' conduct is not actionable under Title VI. It is for this reason that I would reverse.

**4.** Although I reach this conclusion I am aware of a possible analysis that employs *Lau* and arrives at a different result. Since *Lau* is based on a specific HEW regulation rather than the general language of Title VI, *Lau* may be read for the proposition that Title VI permits agencies that administer Title VI funds to impose an impact standard in their regulations although Title VI does not itself require such a standard. *See Lau*, 414 U.S. at 569, 94 S.Ct. at 789; *id.* at 571, 94 S.Ct. at 790 (Stewart, J., concurring). *Board of Education v. Califano*, 584 F.2d 576 (2d Cir. 1978) approved such an analysis, *id.* at 588–89 & n. 38, and a different panel of this court later observed that *Bakke* did not expressly overrule *Lau*. *Parent Association of Andrew Jackson High School v. Ambach*, 598 F.2d 705, 716 (2d Cir. 1979); *accord, Lora v. Board of Education*, 623 F.2d 248 at 252 (1980) (Oakes, J., concurring). This analysis, however, fails to convince me that we should affirm Judge Carter on the Title VI issue.